UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No.  19-10234-FDS |
| | ) | |
| JOHANNY MEJIA-NUNEZ | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

## I.  BACKGROUND

Mr. Mejia-Nunez was raised in the Dominican Republic in dire economic conditions.  He went hungry in his youth.  He left school when he was only in the 8th grade, so that he could join the work force and help his family financially.

Mr. Mejia-Nunez is 44 years old.[1]  He has no criminal record at all.  He is not a United States Citizen but has a green card. He has lived in Pennsylvania since 2003.  He is married with six children.

Mr. Mejia-Nunez entered the United States in 2003, when he was in his late 20's, with a fake visa.  He was later apprehended by immigration due to the visa irregularities.  He cooperated with border agents by immediately and unequivocally admitting that his visa was false.  Agents placed him in removal proceedings.  The immigration judge did not order his removal. Rather, after considering all the circumstances, she waived his

---

[1]     The facts as set forth herein derive from the PSR, unless otherwise stated.

unlawful entry and granted him a green card. See Attachment A, Order of Immigration Judge Miriam K. Mills.

Mr. Mejia-Nunez is blessed with an extremely close-knit and supportive family, depicted in the photographs at the end of this memo.

Prior to his arrest, he lived with his wife Wendy, their six children, and his mother.  Wendy describes Mr. Mejia-Nunez as a "helpful, happy, outgoing man who is a great father and companion." PSR ¶ 51. See also letter from Wendy Rodriguez, Attachment B.  He has four siblings, two in Pennsylvania and two in Massachusetts.  He has "close relationships with his siblings, who are all aware of his involvement in the instant offense and have remained supportive of him." PSR ¶48.  He jointly owns a garage in Philadelphia with his siblings.  His wife co-owns the family home in Philadelphia.

Mr. Mejia-Nunez enjoys engaging with his community. "Everyone in the neighborhood knows [the Mejia's] as a happy family who likes to play." PSR ¶51.  He is "very involved" in his local church and recreational softball league with his three oldest children. PSR ¶56. See also, Attachment C, letter from Holy Innocents Church; Attachment D, letter from Elbin Gonzalez; Attachment E, letter from Kenny Arias; Attachment F, letter from barbershop.

Mr. Mejia-Nunez has "always be[en] employed ... since

coming to the United States." PSR ¶62.  In the years prior to his arrest, he earned money selling cars, working at Property Creations LLC (his brother-in-law's construction company, see Attachment G) and, most recently, as an Uber driver.

It was in the latter position that the unlikely circumstances giving rise to this offense occurred.  While driving for Uber, a fare suggested that Mr. Mejia-Nunez could make a great deal of money transporting drugs.  He offered Mr. Mejia-Nunez his number.  Mr. Mejia-Nunez' involvement in this case arose the moment he accepted that phone number.

In May, 2019, with the assistance of a confidential informant ("CI"), an undercover agent ("UC") made contact with a Mexican National.  The UC expressed an interest in receiving a shipment of fentanyl in Massachusetts.  The UC agreed to purchase 5 kilos of 28 which were destined to Massachusetts for $40,000 per kilo.

The Mexican National's driver transported the shipment on May 18, 2018, but was stopped in New York due to a broken windshield and arrested. TR. 55:25[2] - 56:4; 56:9-11; 57:11-15.

Following that failed delivery, the Mexican National was "apologetic and was essentially scrambling to put the deal back together[,]" and promised to "make it good[.]" TR. 56:15-21.

---

[2]     Reference is made to the transcript of the June 18, 2019 detention and probable cause hearing in this case. Attachment H.

Despite the Mexican National's struggles to "make it good," TR. 56:15-21, the deal remained derailed for a period of several weeks, TR 56:25 - 57:3, while the Mexican National attempted to recruit a replacement driver. TR 57:11-15.

The Mexican National finally resurfaced on June 8, 2018. TR 56:22-24.  The Mexican National spent the three weeks between May 18 and June 8 trying to acquire a replacement driver - Mr. Mejia Nunez. TR 57:11-15.

Law enforcement ultimately decided to postpone the transaction until June 12, 2019.

Police established the date, time, and location of the delivery. TR 58:2-4.  Mr. Mejia-Nunez had "zero" say in the date, time, or location of the delivery. TR 58:2-6.

At all times, the parties to the transaction provided Mr. Mejia-Nunez with the bare minimum information which would allow him to execute his single purpose of driving the narcotics from New York to Massachusetts.  He was not informed how much money he would be picking up in exchange for the contraband he was transporting. TR: 58:11-16.  The parties agreed that, as soon as the transaction was completed, all communication with Mr. Mejia-Nunez was to terminate.  The Mexican National instructed that no phone numbers or other information was to be shared with him. TR 70:5-10.  Those involved in orchestrating the transaction -- the Mexican National and the UC -- agreed that Mr. Mejia-Nunez would

be "cut out" as soon as the instant deal was complete.
TR 70:14-21.

The delivery was accomplished at a hotel parking lot in
Lawrence.  Mr. Mejia-Nunez arrived in one car with his niece
following in another.  While wearing a wire, the CI approached
Mr. Mejia-Nunez as he was seated in the driver's seat of the
first car.  The recording[3] establishes that after exchanging
greetings in Spanish and English, the CI responded to Mr. Mejia-
Nunez with, "no Spanish sorry man."  In the ensuing exchange,
the CI made various statements, to which Mr. Mejia-Nunez
responded with "yeah" (or some variation) or "hmm?," with the
exception of answering "five" to the question "how much?" and
asking the CI to put the money in the other car.  Mr. Mejia-
Nunez never articulated what he had in the car.  Rather, when
asked "China White?" Mr. Mejia-Nunez answered, "hmm?"  When
asked "China White?" again, he made no audible response.  When
asked "China white?" a third time, he said "yes."

Following his arrest, and with the aid of a Spanish
speaking officer, Mr. Mejia-Nunez supplied a statement to
police.  He accepted full responsibility for his offense.  He
clarified that he knew he was transporting drugs but did not
know what kind of drugs he was transporting. TR 61:15-18.

---

[3]     The audio recording is supplied in a media file.  Attachment I.  The
conversation between CI and Mr. Mejia-Nunez commences at minute marker 19:51.

Mr. Mejia-Nunez explained to police how he became involved in the transaction.  He indicated that he would be paid $5,000 for driving the drugs to Massachusetts.  His payment represented 2.5% of the proceeds of the transaction.

Mr. Mejia-Nunez has remained in custody since his June 12, 2019 arrest.

Mr. Mejia-Nunez' family has suffered greatly in his absence.  His wife Wendy's "heart is broken [and] she cannot imagine her life without him." PSR ¶51.  She "had to stop working and collect unemployment as she is now a single mother." Id.  His children have "missed him very much since his arrest." PSR ¶52.

Mr. Mejia-Nunez is stricken by his own stupidity and the carnage it has caused in the lives of his loved ones.  He knows his actions have "destroyed his family ... and feels guilty" for what he has done. PSR ¶56.  The family has not yet figured out how to tell the six children about what will happen to him following completion of his sentence.  As a consequence, "his children do not know that he will most likely be deported to the Dominican Republic." Id.

The parties agree that Mr. Mejia-Nunez has no prior drug involvement of any kind prior to this incident. PSR ¶23.  He has no prior record at all. 33-34.

For purposes of federal immigration law, Mr. Mejia-Nunez'

conviction constitutes an aggravated felony, regardless of the length or type of sentence. 8 U.S.C. § 1101(a)(43)(B). Consequently, he is subject to expedited removal from the United States, 8 U.S.C. § 1227(a)(2)(B) and is ineligible for cancellation of removal. 8 U.S.C. § 1229b(a)(3).  He is permanently ineligible for a finding of good moral character, a necessary condition precedent to naturalization. 8 U.S.C. §§ 1101(f)(8), 1427(a).  His conviction also renders him inadmissible for life. 8 U.S.C. § 1182(a)(2)(A)(i)(II).

## II. <u>THE GUIDELINES</u>

The parties agree that, because he is responsible for more than four but less than twelve kilograms of fentanyl, Mr. Mejia-Nunez' base offense level is 34.  USSG § 2D1.1(c)(3).

Because the parties agree that Mr. Mejia-Nunez qualifies for a mitigating role adjustment, his base offense level is reduced to 31. USSG § 2D1.1(a)(5)(A)(B)(ii).

The parties agree that Mr. Mejia-Nunez clearly and timely accepted responsibility, as a consequence of which, his offense level is further reduced by 3 to level 28. USSG § 3E1.1(a),(b).

The parties agree that Mr. Mejia-Nunez meets the five criteria contained within USSG § 5C1.2(a), reducing his offense level to 26. USSG § 2D1.1(b)(18).

Finally, while the parties agree that Mr. Mejia-Nunez' total offense level must be reduced due to his mitigating role

in the offense, the extent of that reduction is in controversy.

A. **Mitigating Role Adjustment**.

Probation contends that Mr. Mejia-Nunez merits a role adjustment because his "participation in this offense appears to be a one-time occurrence, where he was paid to transport drugs, and there is no evidence that he had any information as to the larger scale operation." PSR ¶23.  Yet, probation concludes that only a two-level reduction as a "minor participant" is warranted. USSG § 3B1.2(b).

On the other hand, Mr. Mejia-Nunez contends that the Court should apply a four-level reduction to reflect his role as a minimal participant. USSG § 3B1.2(a).

This dispute is certainly in line with the historical implementation of role adjustments.  While the United States Sentencing Commission ("USSC") ostensibly arrived at the guidelines "by taking an empirical approach that used as a starting point data estimating pre-guidelines sentencing practice"[4] in order to establish a "heartland"[5] of typical cases reflecting the criminal conduct covered by the guidelines, the drug guidelines jettisoned that empirical approach by scaling the guidelines not to data, but to the weight-based minimum

---

[4]     U.S. Sentencing Guidelines Manual § 1A.1.3 (1987)

[5]     U.S. Sentencing Guidelines Manual § 1A.4.B (1987).

mandatory sentencing structure contained in the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 (1986) ("ADAA").[6] In so doing, the USSC ignored not only the "empirical approach" which informs the guidelines, but also the ADAA's specific legislative intent that its mandatories apply only to "kingpins" and similar leaders and managers, not low-level drug offenders.[7]

Fueling the disconnect between actual culpability and guidelines application, the role adjustments for cases outside of the identified "heartland" are rarely applied:

> Only about 7% of drug trafficking defendants receive an aggravating role adjustment, and only about 13% receive a mitigating role adjustment. Thus, with respect to four out of five defendants, their sentencing ranges reflect no differentiation at all based on their role in the offense.
>
> United States v. Diaz, No. 11-CR-00821-2 (JG), 2013 U.S. Dist. LEXIS 11386, at *77 (E.D.N.Y. Jan. 28, 2013).

Given that grim data, it is no surprise that probation seeks to deny Mr. Mejia-Nunez the adjustment which most accurately reflects his role as the pawn of an unindicted kingpin.

1. **Application Note 3(c)**.

---

[6]   U.S. Sentencing Comm'n, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform 49 (2004).

[7]   U.S. Sentencing Comm'n, Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System 24 (2011).

Application Note 3(c) to USSG § 3B1.2 directs the Court to consider five factors in evaluating the extent to which a mitigating role adjustment applies:

> Factor 1 "the degree to which the defendant understood the scope and structure of the criminal activity."

A rich factual record establishes Mr. Mejia-Nunez' complete ignorance of the "scope and structure of the criminal activity at issue."

Mr. Mejia-Nunez was recruited as a last-minute replacement for the Mexican National's usual delivery driver, following that driver's arrest on May 18, 2018.  A "scrambling" Mexican National, desperate to put a botched deal back together, recruited Mr. Mejia-Nunez -- an Uber driver -- at the 11th hour to stand in for his regular driver.  When Mr. Mejia-Nunez was enlisted, he was kept in the dark as to every aspect of the transaction not absolutely essential to the minimal role he played in its consummation - the parties explicitly agreed that he would be excluded from receiving any other information.  He was told nothing about the identity of any of the involved parties.  He had not the feintest glimpse of the scope, scale, or hierarchy of the involved organization or organizations.  He was not told the type of drug he was transporting, nor the amount of money he was to collect.  The express plan was to immediately sever ties with Mr. Mejia-Nunez the minute the

10

transaction was complete.

> Factor 2 - "the degree to which the defendant
> participated in planning or organizing the criminal
> activity."

Mr. Mejia-Nunez had no role in brokering the deal and had
no input regarding the expected redistribution of the fentanyl.
He played no role in negotiating the type of drugs sold, the
quantity of drugs sold, the purity or packaging of drugs sold,
or the price of the drugs sold.  All of the planning and
organizing was arranged between the Mexican National, the CI,
and the UC - apparently before Mr. Mejia-Nunez was even
recruited.  Mr. Mejia-Nunez had no role in planning or
organizing at all.

> Factor 3 - "the degree to which the defendant
> exercised decision-making authority or influenced the
> exercise of decision-making authority."

Mr. Mejia-Nunez was not granted any decision-making
authority at all.  As established at the probable cause hearing,
he had "zero" say in any aspect of the deal - including where it
occurred, when it occurred, or how it would be conducted.

> Factor 4 - "the nature and extent of the defendant's
> participation in the commission of the criminal
> activity, including the acts the defendant performed
> and the responsibility and discretion the defendant
> had in performing those acts."

The architects of the transaction ensured that Mr. Mejia-

Nunez' participation in the crime was limited to the bare-essentials of driving the load.  He did not participate in finding customers, recruiting workers, negotiating transactions, setting prices, packaging drugs, cutting drugs, or arranging their delivery.  He was granted no discretion of any kind; as stated above, he had no control over any aspect of the transaction - down to the most mundane details including the date, time, and location of its occurrence.

> Factor 5 - "the degree to which the defendant stood to benefit from the criminal activity."

Mr. Mejia-Nunez bore nearly all of the risk of a large-scale drug transaction, but received almost none of the reward. He had no proprietary interest in the drugs.  The transaction itself contemplated a sticker price of $200,000 (5 kilograms at $40,000 per kilogram) - a fact of which Mr. Mejia-Nunez was wholly ignorant.  He was to be paid only $5,000 for his role, which represented just 2.5% of the proceeds of the transaction. Yet, as the man who carried the drugs on hand, he bore almost 100% of the risk.

## 2. **Application Note 4**.

Application Note 4 provides that the minimal participant adjustment "is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge

or understanding of the scope and structure of the enterprise
and of the activities of others is indicative of a role as
minimal participant." (emphasis added).

Probation agrees that "there is no evidence that he had any
information as to the larger scale operation." PSR ¶23.  As
Application Note 4 makes clear, that lack of knowledge is the
quintessential characteristic of a minimal participant.  Despite
the presence of this key characteristic, probation contends that
only a two-level reduction is appropriate.  Probation's position
lacks support in the law or the facts.

In support of its argument, probation first relies on the
quantity of the drugs involved. PSR p. 23.  By relying on drug
quantity in the role in the offense context, probation
fundamentally misapprehends the purpose of the adjustment.  The
mitigating role adjustment and corresponding guideline cap are
animated by, and respond "to concerns that base offense levels
derived from the Drug Quantity Table in § 2D1.1 overstate the
culpability of certain drug offenders who meet the criteria for
a mitigating role adjustment under § 3B1.2.").  U.S. Sentencing
Guidelines Manual app. C, vol. II, amend. 640 (2012).  The role
adjustments are designed to more closely approximate the
relative culpability of each participant in any given
conspiracy, regardless of the amount of drugs involved. See,
e.g., United States v. Johnson, 379 F. Supp. 3d 1213, 1222 (M.D.

Ala. 2019).  That they fail to do so will be discussed separately.  It is sufficient to say that the drug quantity has no bearing on the application of the role in the offense adjustment.[8]

Probation next errs by comparing Mr. Mejia-Nunez' actions to those of his niece who followed him to the hotel.  Probation contends that by following Mr. Mejia-Nunez to the transaction, her role was that of a minimal participant, and his role was more than that.  The comparison is inapt: the niece was not a participant at all.  "[T]o be considered a participant it is ... necessary that an individual gives knowing aid in some aspect of the criminal activity." United States v. Acevedo-Lopez, 873 F.3d 330, 336-38 (1st Cir. 2017).  The niece did not "give[] knowing aid," rather, at the conclusion of the investigation, the government found no "evidence to demonstrate that she knew what the defendant was engaged in[.]" PSR ¶14.[9]

In focusing on the niece, probation ignored the actual

---

[8]    To that point, it is noteworthy that the Department of Justice found that, due to the nature of sophisticated conspiracies involved in large-scale drug enterprises, individuals on the periphery were more likely to be involved with more drugs than "street-level dealers and almost as much as high-level dealers." U.S. Dep't of Justice, Nat'l Inst. of Justice, An Analysis of Non-Violent Drug Offenders with Minimal Criminal Histories 12 (1994).


[9]    This is not to say that the Court cannot consider Mr. Mejia Nunez' decision to bring his niece along in its overall 18 U.S.C. 3553(a) analysis.

participant[10] to whom Mr. Mejia-Nunez must be compared: the Mexican National who actually owned the drugs.[11]   Compared to the Mexican National, the propriety of a minimal participant adjustment here is beyond credible debate.

Mr. Mejia-Nunez' role was that of one-time replacement courier.   In 2011, the USSC published a report which identified the various roles in drug cases by analyzing 15 percent of all drug cases reported in fiscal year 2009. U.S. Sentencing Comm'n, 2011 Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System, at 165 (2011).   This data allowed the USSC to identify nine distinct categories of "offender function." Id. at 166.

As the individual who only "transport[ed] or carr[ied] drugs using a vehicle or other equipment," the USSC categorizes Mr. Mejia-Nunez' role as "courier." Id. Notably, the "courier" role is the eighth lowest out of the Sentencing Commission's nine categories of "offender functions" which decrease in culpability. Id.   Only the role of "mule" is less serious, and that role is distinguished from that of a courier only by virtue

---

[10]   The guidelines specifically exclude the undercover officer as a participant. USSG § 3B1.1, Application Note 1.  Although the CI may qualify as a conspirator, the government provided insufficient information regarding its involvement (and crucially, involvement preceding its work as an informant) to permit an understanding of its extent.

[11]   Other participants need not be charged for the mitigating role adjustment to apply. United States v. Groenendal, 557 F.3d 419, 426-27 (6th Cir. 2009).

of the latter's use of a vehicle to facilitate transport while the former transports the drugs on his person. Id. at 167.

Thus, under the USSC's own definition, Mr. Mejia-Nunez' "courier" role is "plainly among the least culpable" in the instant offense.

That a person acted as a courier does not automatically entitle him to the "minimal participant" reduction, because "some couriers may be fringe participants in a drug-trafficking scheme, but others may be more central to the plot." United States v. Quinones-Medina, 553 F.3d 19, 23 (1st Cir. 2009).  In Quinones-Medina, though the defendant "labor[ed] to portray himself as a simple courier who was participating in his first drug transaction," the evidence showed otherwise. Id. at 22. The evidence suggested that "he played an active role in the cocaine-sale negotiations. In that capacity, he attended at least two face-to-face meetings with the putative purchaser, during which the participants discussed not only the planned sale of five kilograms of cocaine but also the possible transport of even larger quantities of contraband from St. Thomas to Puerto Rico." Id. at 23.  On this evidence, that defendant was neither "less culpable than most of those with whom he collogued [nor] the mine-run of other miscreants who have committed similar crimes." Id. at 22. Cf. United States v. Vargas, 560 F.3d 45, 48 (1st Cir. 2009) (inconsistent statements

combined with information from cooperating witness cast doubt on truthfulness of defendant's claimed ignorance of the scope of the conspiracy and degree of complicity).

In contrast, Mr. Mejia-Nunez is the archetypal minimal participant.  He is the "fringe participant" described in Quinones-Medina, supra at 23.

Mr. Mejia-Nunez' conduct in this case compares favorably to that in United States v. Cabrera, 567 F.Supp. 2d 271, 272 (D. Mass. 2008).  Cabrera was recruited at the last minute to pick up drugs brought from Texas, had no role in negotiating the deal, and had no proprietary interest in the drugs. Id.  The purchasers did not trust him and he was to receive a small piece-work wage which had no bearing on the actual value of the drugs. Id.  He had no prior record and was unknown to police. Id.

Like the instant case, the true culprits escaped prosecution.  Like Mr. Mejia-Nunez, Cabrera got caught "holding the bag." Id.

In granting Cabrera a four-level reduction for his role as a minimal participant, the Court observed:

> Looking beyond the fortuity of whom the
> government caught in this sting to the
> importers, high level supplier, growers,
> money-launderers, financiers, etc., Cabrera
> is clearly among the least culpable. Id.

Mr. Mejia-Nunez is materially indistinguishable from

Cabrera.  He had no proprietary interest in the drugs.  He had never been involved in any drug activity before this transaction.  He was recruited in a last-minute effort to salvage a botched deal, following which those in control intended to exclude him upon its completion.  His role was as mechanical, minimal, and fungible as exists in the drug trade - that of a one-time backup mule.  The organization provided him no information, no decision-making authority, no discretion, and negligible reward, despite his shouldering all of the risk.  These circumstances combine to establish him as "plainly among the least culpable of those involved in the conduct of a group" - the Mexican National and his unidentified conspirators.

Stated simply, Mr. Mejia-Nunez acted on the farthest margin of the instant conspiracy as a one-time replacement courier.  He must be afforded a four-level reduction pursuant to USSG § 3B1.2(a), resulting in a total offense level of **22**.

### III.  <u>CRIMINAL HISTORY</u>

Mr. Mejia-Nunez has no prior record, placing him in criminal history category **I**. USSG § 4A1.1.

### IV.   <u>FACTORS WARRANTING DEPARTURE</u><br><u>OR NON-GUIDELINES SENTENCE.</u>

Based upon a total offense level of 22 and criminal history category I, the guidelines recommend a sentence range of 41 to 51 months' imprisonment. USSG §5A.  However, the Court has

flexibility in sentencing.  For the reasons discussed herein, and for other reasons that he may articulate at the sentencing hearing, Mr. Mejia-Nunez requests that the Court sentence him to imprisonment for not more than 21 months.  Mr. Mejia-Nunez submits that this sentence is "sufficient, but not greater than necessary" to achieve the sentencing purposes of 18 U.S.C. § 3553(a).

A. **The Drug Quantity Does Not Reflect Mr. Mejia-Nunez' Culpability**.

As in all such cases, the driving factor of Mr. Mejia-Nunez' guidelines score is the weight of the drugs.  However, reflecting the pioneering traditions of the judiciary in this Commonwealth, in 2008, the Honorable Justice Nancy Gertner (ret.) was among the first to recognize that the sentencing guidelines' focus on drug quantity results in

> a classic case of false uniformity[, which] occurs when we treat equally individuals who are not remotely equal because we permit a single consideration, like drug quantity, to mask other important factors. Drug quantity under the Guidelines treats as similar the drug dealers who stood to gain a substantial profit, here the purchasers who escaped, and the deliveryman, Cabrera, who received little more than piecework wages.

> Cabrera, supra, at 273.

Judges may "vary from the Guidelines based solely on [their] judgement that the policies behind the guidelines are wrong." United States v. Irey, 612 F.3d 1160, 1212 (11th Cir.

2010) (en banc) citing United States v. Kimbrough, 552 U.S. 85, 109-10 (2007).

Following Judge Gertner's lead, many federal judges have done just that because they recognize that "drug quantity is a poor proxy for culpability," Diaz, supra at *72. See also Johnson, supra at 1217; United States v. Hayes, 948 F. Supp. 2d 1009 (N.D. Iowa 2013); United States v. Saldana, No. 1:17-cr-271-1, 2018 U.S. Dist. LEXIS 110790 (W.D. Mich. July 3, 2018); United States v. Ibarra-Sandoval, 265 F. Supp. 3d 1249 (D.N.M. 2017); United States v. Carrillo, No. 2:17-cr-00082-KJM, 2020 U.S. Dist. LEXIS 31338 (E.D. Cal. Feb. 21, 2020); United States v. Vang, 789 F. Supp. 2d 1020 (E.D. Wis. 2011); United States v. Woody, No. 8:09CR382, 2010 U.S. Dist. LEXIS 72909 (D. Neb. July 20, 2010).

These courts have recognized that the weight-based guidelines do not arise from "the Commission's exercise of its characteristic institutional role' to 'base its determinations on empirical data and national experience." Johnson, supra at 1217-1218.  Rather, as discussed more fully supra at II.A, the USSC patterned § 2D1.1 on the 1986 ADAA, which "used the weight (and thus quantity) of the drugs involved in the offenses as the sole proxy to identify 'major' and 'serious' dealers." Id. at 1219 (citations omitted).

In Mr. Mejia-Nunez' case, "drug quantity most assuredly is

20

not an accurate proxy" for his culpability. Cabrera, supra at
277.  Like the defendant in Cabrera, there is a substantial
difference between Mr. Mejia-Nunez and the Mexican drug lord who
owned the drugs, and who escaped prosecution: Mr. Mejia-Nunez is

> a first offender ... sent on a mission about
> which he knew little and from which he was
> to make little money ... [T]he way [Mr.
> Mejia-Nunez] came into the transaction makes
> it clear that his culpability is unrelated
> to the amount of [fentanyl] on offer. He did
> not negotiate the sale or know the quantity
> involved before meeting the agents. As far
> as [Mr. Mejia-Nunez] was concerned, the
> quantity was only happenstance; it could
> equally have been 1.4 kg or 28 kg ...
> Indeed, it would not be surprising if [Mr.
> Mejia-Nunez] was selected precisely because
> he ... had limited information and thus
> could compromise the operation as little as
> possible.

> Id. at 277 - 278.

The mitigating role adjustment and cap which apply to Mr.
Mejia-Nunez are "limited and do not come close to offsetting the
high quantity-driven base offense level." Id. at 272-273; see
also Johnson, supra at 1222 ("the mitigating and aggravating
role adjustments under USSG §§ 3B1.1 and 3B1.2 allow for only up
to eight levels of differentiation. This pales in comparison to
the up to 32 levels of differentiation among defend[ants] based
on drug quantity enshrined by USSG § 2D1.1(c).")

Additionally, if escalating punishment by weight is meant
to deter trafficking narcotics in large quantities, then in this

case such a deterrence is non-sensical in conjunction with the adjustment for minimal participation. For any deterrence to have an effect on the decisions of a defendant, the defendant would have to become more involved in any narcotics transaction. By punishing an ignorant offender for the weight of the narcotics, the law is punishing someone for being a minimal participant.

Kingpins and profiteers possess an ownership interest in their narcotics.  In those cases, it makes sense to vary penalty by the scale of the offender's enterprise, with street dealers getting more lenient sentences than international drug lords. But as to those who occupy fringe "worker" roles such as couriers like Mr. Mejia-Nunez, the link between weight and culpability is attenuated.  An accurate metric of culpability for these non-stakeholders is tied to the role they play, not the scope of the enterprise or the "happenstance" of how much is put in their car. Cabrera, supra at 277 - 278.

USSG § 5K2.0(a)(3) authorizes downward departures where a circumstance already taken into account in determining the guideline range exists to a degree that the guidelines do not adequately account for.  Alternatively, the Court can impose a non-guidelines sentence.  Either mechanism is appropriate for the Court to sentence Mr. Mejia-Nunez below his guidelines range in order to reflect that his guidelines score overrepresents his culpable conduct.

**B. The Court Must Account for the Additional Consequence of Deportation Flowing from Mr. Mejia-Nunez' Conviction.**

In United States v. Hercules, 947 F.3d 3 (1st Cir. 2020), the First Circuit held that a sentencing court may consider the immigration consequences of a conviction in determining the appropriate sentence.  The Supreme Court has recognized that "deportation is an integral part -- indeed, sometimes the most important part -- of the penalty that may be imposed on noncitizen defendants[.]" Padilla v. Kentucky, 559 U.S. 356, 364 (2010).

Although Mr. Mejia-Nunez is not a United States citizen, he has made the United States his family home for nearly 17 years. He and his wife are raising six children together in Pennsylvania, some of whom are United States citizens and some of whom are permanent residents.  His mother and four siblings live in the United States.

Despite his long-standing history and family ties in this country, his conviction in this case renders him deportable, inadmissible, and ineligible for naturalization, with virtually no avenue for discretionary relief. 8 U.S.C. § 1101(a)(43)(B); 8 U.S.C. § 1227(a)(2)(A)(ii); 8 U.S.C. § 1229b(a); 8 U.S.C. § 1101(f)(8); 8 U.S.C. § 1427(d); 8 U.S.C. §§

1182(a)(2)(A)(i)(II), (h).

In other words, unlike citizens convicted of the same offense, Mr. Mejia-Nunez will suffer the additional penalty of lifetime banishment from his home and his family.  Those consequences are particularly stinging in the case of Mr. Mejia-Nunez who, as the PSR reflects, is deeply connected with his family, all of whom reside in the United States.

After completing his prison sentence, it is practically inevitable that he will enter immigration custody, after which he will be permanently deported.  Mr. Mejia-Nunez will never return to the life he knew before his arrest.  He will never again enter the home where his beloved wife and children reside. He will no longer be there to raise them.  That Mr. Mejia-Nunez faces exile from his family and home as a consequence of his crime is not a marginal component of his case.  As Justice Brandeis observed nearly a century ago, "To deport ... deprives [one] of liberty...; of all that makes life worth living." Ng Fung Ho v. White, 259 U.S. 276, 284 (1922).  It is one of the harshest penalties ever provided by law.[12]  That Mr. Mejia-Nunez

---

[12]    Though the punishment of banishment has been employed since ancient times, at the time this country was founded, our founders were repulsed by it; so much so that "very likely the Constitution would have failed of ratification if the members of the state conventions had been told that the proposed national government would be able to throw people out of this country." Michael A. Armstrong, Banishment: Cruel and Unusual Punishment, at 759, U. Pa. L. Rev (1962) quoting Chafee, Three Human Rights in the Constitution of 1787, at 205-206 (1956) and citing Douglas, An Almanac of Liberty, 135 (1954).

suffers this fate, when others who commit the identical offense do not, can and must be accounted for in determining the appropriate sentence.

    **C. The Court Must Account for Mr. Mejia-Nunez' Health in Ascertaining the Appropriate Sentence**.

Mr. Mejia-Nunez suffers from mixed hyperlipidemia and obesity.  Although these conditions would have no relevance to his sentence under normal conditions, current circumstances are far from normal in the wake of the COVID-19 pandemic.

Mr. Mejia-Nunez' most recent medical records reflect a BMI of 37.57.  The CDC cautions that having a BMI of 30 or higher increases a person's risk of severe illness from COVID-19.[13]  The CDC also identifies cardiovascular disease as a factor which can increase one's risk of serious illness related to COVID-19. Id.

The CDC has warned that correctional and detention facilities "present[] unique challenges" for control of the virus, confirming what common sense already tells us - that prisoners live in congregate settings exposes them to higher risk of exposure and, in the case of those like Mr. Mejia-Nunez who present underlying illnesses, death from the virus.[14]  Mr. Mejia-Nunez' medical conditions, and the elevated risks those

---

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#obesity

https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

conditions pose through continued incarceration during the
pandemic, should be considered in imposing sentence.

D. **No Further Deterrence is Needed to Protect the Public**.

18 U.S.C. § 3553(a) instructs that the factors to consider
in determining a defendant's sentence include deterrence and
protecting the public from their further crimes.  But the
available data shows that prison sentences have little impact on
the "opioid epidemic" or recidivism - and even less so in the
case of low-level offenders such as Mr. Mejia-Nunez, a one-time
courier.

> "[T]he federal prison population soared
> [from 5,000 to 92,000 between 1980 and 2015]
> without delivering a convincing public
> safety return. In fact, self-reported use of
> illegal drugs increased between 1990 and
> 2014 ... as has the availability of heroin,
> cocaine, and methamphetamine as indicated by
> falling prices and a rise in purity."
>
> The PEW Charitable Trusts, More Imprisonment
> Does Not Reduce State Drug Problems, 2
> (March 8, 2018).[15]

"The surge in federal prison spending has also failed to
reduce recidivism.  The rate of federal drug offenders who leave
prison and are placed on community supervision but commit new
crimes or violate the conditions of their release has been
roughly a third for more than three decades." Id.

---

[15]     Available at https://www.pewtrusts.org/en/research-and-analysis/issue-
briefs/2018/03/more-imprisonment-does-not-reduce-state-drug-problems

The government's primary rationale for seeking incarceration in drug cases is in service of its ill-fated war on drugs.  But where the uncontested evidence shows that incarceration is a wholly impotent weapon in that war, further incarceration of Mr. Mejia-Nunez to "send a message" is entirely unwarranted.

Likewise, additional incarceration is unnecessary to specifically deter Mr. Mejia-Nunez from committing similar crimes.  Mr. Mejia-Nunez was 43 years old at the time of the instant offense.  That he has no criminal history points places him among the least likely of all offenders to recidivate. Cabrera, supra, at 279 (individuals "with zero criminal history points are less likely to recidivate than all other offenders.") Frankly, that Mr. Mejia-Nunez lived for 43 years without any prior drug involvement provides ample support for the inference that he will not re-offend.  To the extent that any punishment is necessary to further chasten him, that Mr. Mejia-Nunez has spent fourteen months in jail, and now faces lifetime exile from his family for his first and only crime more than adequately accomplishes that goal.

## V. <u>RECOMMENDED SENTENCE</u>

This Honorable Court should impose a sentence of imprisonment of not more than 21 months, which constitutes a 20-month variance from the low-end guideline sentence of 41 months

applicable to offenders in criminal history category I with a total offense level of 22.

A 21-month variance is appropriate for several reasons.

First, flowing from the judiciary's recognition, nationwide, that the sentencing regime in drug cases does not reflect the "heartland" of drug offenses, the "average sentences in cocaine and heroin cases have ... consistently been about 20 months below the bottom end of the applicable range."[16]

Thus, a 21-month variance is "need[ed] to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Second, the variance is necessary to compensate for the fact that, as to Mr. Mejia-Nunez, in his role of one-time courier, the guidelines place a disproportionate emphasis on drug weight.  Given his lack of proprietary interest in the narcotics, the penalty should be weighted principally on his role in the offense, with little consideration of the

---

[16]    Diaz, supra at *49, citing Judge Patti B. Saris, Chair, U.S. Sentencing Comm'n, Prepared Testimony Before the Subcommittee on Crime, Terrorism, and Homeland Security, Committee on the Judiciary, United States House of Representatives (Oct. 12, 2011), at 33, 36, 43, available at http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_an d_Reports/Testimony/20111012_Saris_Testimony.pdf and U.S. Sentencing Comm'n, Preliminary Quarterly Data Report: 3rd Quarter Release, Preliminary Fiscal Year 2012 Data, Through June 30, 2012 37, fig. H (2012) (depicting the average sentence in all drug trafficking cases from Fiscal Years 2007 to 2011 to be about 20 months  below the bottom end of the average Guidelines range minimum).

"happenstance" of drug weight.

Third, the proposed variance takes into consideration the draconian penalty of deportation which Mr. Mejia-Nunez will suffer, and which similarly situated offenders will not, as a direct result of the instant offense.

Fourth, the variance is warranted in light of the elevated risk to Mr. Mejia-Nunez' health and safety while incarcerated during the time of a pandemic.

Finally, the requested variance is warranted when considering that general deterrence is ineffective as applied to this particular offense category, and further specific deterrence is unnecessary given the time already served and the inevitable immigration consequences which will follow.

## VI. <u>CONCLUSION</u>

For the reasons stated above, Mr. Mejia-Nunez respectfully requests that this Honorable Court impose a sentence of 21 months.

Respectfully submitted,
Johanny Mejia-Nunez
By and through his Attorney,
<u>/s/ Murat Erkan</u>
Murat Erkan, BBO# 637507
Erkan & Associates, LLC
300 High Street
Andover, MA 01810
(978) 474-0054

Date:  December 8, 2020

**CERTIFICATE OF SERVICE**

I, Murat Erkan, hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 8, 2020.

/s/ Murat Erkan
Murat Erkan, BBO# 637507
Erkan & Associates, LLC
300 High Street
Andover, MA 01810





Attachment A

June 17, 2019

To Whom May It Concern:

**AFFIDAVIT OF RELATIONSHIP**

The undersigned WENDY RODRIGUEZ, current resident at 1036 Herbert Street, Philadelphia, PA 19124, born on April 22, 1980, born in Santo Domingo, Dominican Republic, US Citizen of the United States, being duty sworn depose and say:

That I am the Mr. JOHANNY MEJIA's wife, that I married Mrs. Mejia on October 09, 2007, but all together we have a relationship for about fourteen years (14) years.

That Johanny is an excellent father of our six (6) kids, two biological and the other 4 form our previous relationship, which we're raising together. Johanny is my partner of life, loving, with me with our children, always concerned with their relatives. Excellent father when it comes to the education of our children ever present in all the school children's children's school children. He is an honest, hard-working person, always willing to collaborate with any of his friends who need him.

Johanny loves his family unconditionally just as we love him. He is always willing and present in all family and home activities, co-operator with household chores. In other words my husband is an example of a person to follow; in this world there are few human beings with moral values as high as my husband has it. Me and our children are very proud of the husband and father we have. He is simply a gift from God in our lives.

If you have any further concern I will be more than happy to help, feels free to contact me at my phone 215-954-2943.

Yours truly,

WENDY RODRIGUEZ
*Subscribed and sworn to before me this June 17, 2019, at Lawrence, Massachusetts.*
***Sally's Tax & Immigrant Services,*** *located at 375 Common Street, Suite 201A, Lawrence, MA 01840. Phone 978-655-4296/ 917-402-2483.*

*Sally Antigua Notary Public*
*My Commission Expires on May 1, 2020*

OFFICIAL SEAL
SALLY A. ANTIGUA
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS
My Comm. Expires May 1, 2020

**Attachment B**

IMMIGRATION COURT
900 MARKET STREET, SUITE 504
PHILADELPHIA, PA 19107

In the Matter of

MEJIA NUNEZ, JOHANNY
Respondent

Case No.: A087-218-245

IN REMOVAL PROCEEDINGS

ORDER OF THE IMMIGRATION JUDGE

This is a summary of the oral decision entered on ___6/10/2014___
This memorandum is solely for the convenience of the parties. If the
proceedings should be appealed or reopened, the oral decision will become
the official opinion in the case.

[  ]  The respondent was ordered removed from the United States to
      or in the alternative to .
[  ]  Respondent's application for voluntary departure was denied and
      respondent was ordered removed to  or in the
      alternative to .
[  ]  Respondent's application for voluntary departure was granted until
      upon posting a bond in the amount of $
      with an alternate order of removal to . _____
Respondent's application for: .
[  ]  Asylum was (  )granted  (  )denied(  )withdrawn.
[  ]  Withholding of removal was (  )granted (  )denied  (  )withdrawn.
[X]  A Waiver under Section 237A was (X)granted (  )denied (  )withdrawn.
[  ]  Cancellation of removal under section 240A(a) was (  )granted  (  )denied
      (  )withdrawn.          *237(a)(1) H
Respondent's application for:
[  ]  Cancellation under section 240A(b)(1) was (  ) granted  (  ) denied
      (  ) withdrawn.  If granted, it is ordered that the respondent be issued
      all appropriate documents necessary to give effect to this order.
[  ]  Cancellation under section 240A(b) (2) was  (  )granted  (  )denied
      (  )withdrawn.  If granted it is ordered that the respondent be issued
      all appropriated documents necessary to give effect to this order.
[  ]  Adjustment of Status under Section _____ was  (  )granted  (  )denied
      (  )withdrawn.  If granted it is ordered that the respondent be issued
      all appropriated documents necessary to give effect to this order.
[  ]  Respondent's application of (  ) withholding of removal  (  ) deferral of
      removal under Article III of the Convention Against Torture was
      (  ) granted  (  )  denied  (  )  withdrawn.
[  ]  Respondent's status was rescinded under section 246.
[  ]  Respondent is admitted to the United States as a _____ until _____.
[  ]  As a condition of admission, respondent is to post a $ _____ bond.
[  ]  Respondent knowingly filed a frivolous asylum application after proper
      notice.
[  ]  Respondent was advised of the limitation on discretionary relief for
      failure to appear as ordered in the Immigration Judge's oral decision.
[  ]  Proceedings were terminated.
[  ]  Other: _____
      Date: 6/10/2014

                                   MIRIAM K. MILLS
                                   Immigration Judge
Appeal: Waived/Reserved   Appeal Due By: 7/10/2014

                  D HS .

33

Attachment C

**Holy Innocents Church**
1337 East Hunting Park Avenue
Philadelphia, PA 19124
phone – 215-743-2600
fax – 215-743-8041

June 17, 2019

Immigration Office

To Whom It May Concern:

Please be advised that Johanny Mejia and Wendy Rodriguez are registered members of Holy Innocents Parish. They reside at 1036 Herbert Street, Philadelphia, PA 19124.

If I can be of any further assistance, please don't hesitate to contact me at the above telephone number. Thank you.

Sincerely,

Fr. Tom Higgins

Rev. Thomas M. Higgins
Pastor

**Attachment D**

To Whom it may concern

My name is Elbin Gonzalez
I'm the owner of the softball
team Aguilas that Mr. Johanny
Mejia Nunez has played with
me and my team for years.
And has participated in alot
of Family events Great honest
Respectful Person. And hes
a great father figure his son
is always beside him since he
started playing For me 8yrs
ago Now his son is old enough
to play Now And he is Diany
Mejia. Great kid. Johanny Mejia
Is a Great Person Family man
I know him Personally for 13 yrs
Great Person Friend Family man.

**Attachment E**

June 17 2019

To whom may it concern :

I kenni Arias knows Johanny mejia  who resides at 1036 Herbert st, Philadelphia PA 19124. for approximately 13 years, he is a good person for the community, I always saw that he taking care his family and his children , he play softball  for the same team that my son play , He took all her kids to his game and he is always around his family. He is a excellent father and extraordinary person that cares for others.

If you have any others questions feel free to call at 267-591-7393

Sincerely
Kenni Arias

**Attachment F**

**J & D Barber Shop**
1705 Worrell Street
Philadelphia, PA 19124
267-241-5498

17th June 2019

To Whom it May Concern,

This letter is being written to advise you that our customer and friend Mr. Johanny Mejia Nunez has been a loyal client for many years now. Mr. Nunez frequently stops by our barber shop with his children. In the years I have known him he has proven to me that he is very responsible and caring for his family. I personally have had the opportunity to meet all of his family. They seemed to me, to be a hardworking and honest family.

If you need additional information you can contact me at jluna.joseluna@gmail.com

Sincerely,

**Jose Maria Luna**

## Attachment G

Philadelphia, PA
June 17, 2019

To whom it may concern.

I have known Mr. Johanny Mejia Nuñez for many years now. I first met him 11 years ago and we have developed a good relationship since then. For the past 2 ½ years Johanny has become part of our work team at Properties Creations, LLC. He has proven to be an extremely competent member of our team. His work performance is very efficient and detail-oriented. He is very good with managing his time and completing his work on a timely basis. Without Johanny, our construction business would not be as successful as it is today.

Mr. Mejia-Nuñez has a beautiful family, his wife and six children whom he loves dearly. He is a family-oriented man and I've known him to always be a good provider for them and his parents whom he also supports.

He stays involved in his children's school activities and is also involved in their extracurricular activities within his community such as softball practice, games, and after school programs. He volunteers his time and gets involved in any activities which may benefit his children, family and surrounding community.

I admire Johanny's work ethic and consider him to be an asset to our company's future. I genuinely depend on him and on his support and hard work. I also admire his dedication to his family and know how much he is loved and depended on by them. His involvement in support of his community is also to be admired. In short, I consider him to be a great coworker and friend and know many of my friends and family who feel the same way about him.

If you have any further questions or concerns about Mr. Mejia-Nunez, please do not hesitate to contact me either in writing or by phone at your convenience.

Sincerely,

*Damaso Rodriguez*
DAMASO RODRIGUEZ
PROPERTIES CREATIONS, LLC

*Ramon Rosario*

Commonwealth of Pennsylvania
County of _Phila_

Commonwealth of Pennsylvania - Notary Seal
RAMON A. ROSARIO, Notary Public
Philadelphia County
My Commission Expires October 16, 2021
Commission Number 1311483

Sworn to and subscribed before me
this _17_ day of _June_, 20_19_

**Attachment H**

<pre>
 1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
 2

 3

 4                                    )
     UNITED STATES OF AMERICA,        )
 5                                    )
             Plaintiff,               )
 6                                    )   Criminal Action
     v.                               )   No. 1:19-mj-07199-JCB-1
 7                                    )
     JOHANNY MEJIA-NUNEZ,             )
 8                                    )
             Defendant.               )
 9                                    )

10

11            BEFORE THE HONORABLE JENNIFER C. BOAL
                 UNITED STATES MAGISTRATE JUDGE
12

13

                DETENTION AND PROBABLE CAUSE HEARING
14

15

                          June 18, 2019
16

17

               John J. Moakley United States Courthouse
18                        Courtroom No. 14
                        One Courthouse Way
19                   Boston, Massachusetts 02210

20

21

                        Linda Walsh, RPR, CRR
22                       Official Court Reporter
               John J. Moakley United States Courthouse
23                 One Courthouse Way, Room 5205
                    Boston, Massachusetts 02210
24                     lwalshsteno@gmail.com

25
</pre>

```
 1    APPEARANCES:

 2   On Behalf of the Government:

 3        UNITED STATES ATTORNEY'S OFFICE
          By: AUSA Corey Steinberg
 4        One Courthouse Way
          Boston, Massachusetts 02210
 5        617-748-3141
          corey.steinberg@usdoj.gov

 6

 7   On Behalf of the Defendant:

 8        ERKAN & ASSOCIATES
          By: Murat Erkan, Esq.
 9        300 High Street
          Andover, Massachusetts 01810
10        978-474-0054
          murat@erkanlaw.com

11

12

13

14            Proceedings recorded by sound recording and
                produced by computer-aided stenography
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                              INDEX

 2   WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

 3   DEAN LeVANGIE

 4       By Ms. Steinberg          7
         By Mr. Erkan                     52
 5
     JORGUIN MEJIA
 6
         By Mr. Erkan             76
 7       By Ms. Steinberg                 80

 8
                          E X H I B I T S
 9

10                       DESCRIPTION              RECEIVED

11   GOVERNMENT EXHIBITS

12     1A-1P ..........................................   6

13     2     ..........................................   6

14     3     ..........................................   6

15     4     ..........................................   6

16
                         DESCRIPTION              RECEIVED
17
     DEFENDANT EXHIBITS
18
       A     ..........................................  71
19
       B     ..........................................  73
20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2           THE CLERK:  Today is June 18, 2019.  We're on the

 3    record in the matter of United States v. Mejia-Nunez, case

 4    number is 19MJ7199.

 5           Will counsel please identify themselves for the

 6    record.

 7           MS. STEINBERG:  Good -- I have to think -- afternoon,

 8    Your Honor.  Corey Steinberg appearing on behalf of the United

 9    States, and I was going to ask you -- I just sent my intern

10    upstairs to get a piece of paper I left, but I was going to ask

11    if it would be okay if she sat at counsel table just to assist

12    me with the exhibits and just to give her experience.

13           THE COURT:  Yes, that would be fine.

14           MS. STEINBERG:  Thank you.

15           THE COURT:  So I guess we'll take a break whenever --

16    I mean, in your questioning whenever she comes back in.

17           MS. STEINBERG:  She should be back in a minute, but

18    yes.  Thank you, Judge.

19           THE COURT:  All right.

20           MR. ERKAN:  Hello, Your Honor.  Good afternoon.  My

21    name is Attorney Murat Erkan, and I'm retained counsel for the

22    Defendant.

23           THE COURT:  All right.  And so we're here for both a

24    detention hearing and a probable cause hearing.  Mr. Erkan, did

25    you wish to go forward with both of these hearings?
```

```
 1            MR. ERKAN:  Please, Your Honor.

 2            THE COURT:  And I understand that the Defendant has

 3    not been interviewed.  So -- and I think Mr. York may have

 4    explained to you, I will need a pretrial services interview and

 5    a report to make a decision.  I didn't know what everyone's

 6    schedules were so I'm happy to go forward if folks would like

 7    to do that, but I will need to get a report.  When I get a

 8    report, I believe Probation will make it available at your

 9    office, is that correct, if folks want to come and see it?

10            U.S. PROBATION:  That's true, Your Honor.  I will let

11    them know.

12            THE COURT:  Okay.  So then you will have to go to

13    Probation, look at it, and once I get the report, I'll give you

14    48 hours or so to file any comments that you have with respect

15    to the report.

16            MR. ERKAN:  Thank you, Your Honor.

17            THE COURT:  Okay.  So I have -- is this your....

18            MS. STEINBERG:  Yes, it is, and her name is Kayla

19    Serfoss.

20            THE COURT:  So I have Government's Exhibits -- I have

21    four exhibits from the Government.  Mr. Erkan, do you have a

22    copy of the exhibits?

23            MR. ERKAN:  I did receive a copy, Your Honor.  Thank

24    you.

25            THE COURT:  All right.  And do you have any objection
```

1  to their admission for purposes of this hearing?

2          MR. ERKAN:  I do not, Your Honor.  Thank you.

3          THE COURT:  Okay.  All right.  So Government Exhibits

4  1, and I think there were multiple components of 1, through 4

5  are admitted for purposes of this hearing only.

6          (Government Exhibits 1A to 1P and 2 to 4 received in

7          evidence.)

8          THE COURT:  Ms. Steinberg, do you have a witness?

9          MS. STEINBERG:  I do, Your Honor.  Task Force Officer

10  Dean LeVangie will be testifying for the Government.

11          THE CLERK:  Please raise your right hand.

12          (Witness sworn.)

13          THE WITNESS:  I do.

14          THE CLERK:  Please state your full name for the record

15  and spell your last name.

16          THE WITNESS:  My name is Dean LeVangie, L-e capital

17  V-a-n-g-i-e.

18          THE CLERK:  Thank you.  Please be seated.

19          THE WITNESS:  Thank you.

20          MS. STEINBERG:  May I begin, Your Honor?

21          THE COURT:  Yes.

22          MS. STEINBERG:  Thank you.

23          DEAN LeVANGIE, having been duly sworn by the Clerk,

24  was examined and testified as follows:

25                          DIRECT EXAMINATION

```
 1   BY MS. STEINBERG:
 2   Q.    If you could please tell the Court where you're employed.
 3   A.    I'm a Massachusetts State Police officer assigned as a
 4   task force officer with Homeland Security Investigations.
 5   Q.    How long have you been assigned as a task force officer to
 6   Homeland Security?
 7   A.    Roughly 13 years.
 8   Q.    Prior to that responsibility of jumping on as a task force
 9   officer, do you have prior law enforcement experience?
10   A.    Yes.
11   Q.    How long -- I'm assuming the Mass. State Police before you
12   became a TFO; is that correct?
13   A.    Correct.
14   Q.    And how long were you with them prior to your service as a
15   task force officer?
16   A.    I've been with the State Police for 31 years in total.  So
17   roughly 15, 18 years prior.
18   Q.    Prior to that any law enforcement experience?
19   A.    No, ma'am.
20   Q.    As a task force officer with Homeland Security what kinds
21   of cases have you been primarily focusing on in the last couple
22   of years?
23   A.    The primary focus of our investigations, and myself
24   included, narcotic-related offenses and money laundering
25   investigations.
```

1  Q.   Have you been seeing any specific drugs that you're seeing

2  more of an uptick in their staff?

3  A.   Yes, ma'am.

4  Q.   Is there one in particular that you've been seeing a

5  problem with?

6  A.   In the last several years the big uptick in the drug being

7  distributed and sold in the area is fentanyl.

8  Q.   Is there a specific area in the State of Massachusetts

9  where it seems as though the issues or the sale of fentanyl has

10  really been on the rise?

11  A.   Yes, ma'am.

12  Q.   And where would that be?

13  A.   The majority of our investigations currently are being

14  conducted in the Lawrence area.

15  Q.   What types of things are you seeing happen in the Lawrence

16  area as it relates to the sale of fentanyl?

17  A.   We're seeing a large uptick in the street level

18  distribution of it as well as the bulk level distribution of

19  it.

20  Q.   Is there, based on the investigations you've done, a

21  specific origin of where the large amounts of -- bulk amounts

22  of fentanyl seem to be originating?

23  A.   Yes, ma'am.

24  Q.   Where is that?

25  A.   That's coming from -- the bulk amounts of narcotics,

1    specifically fentanyl, are coming from the Southwest border of

2    the United States.

3    Q.   Would that include Mexico?

4    A.   Yes, ma'am.

5    Q.   As a task force officer, have you had the opportunity to

6    work with what we all refer to as confidential informants?

7    A.   Yes, ma'am.

8    Q.   And are confidential informants often paired with a law

9    enforcement officer who sort of oversees them?

10   A.   Yes.  There would be a controlling officer, yes, ma'am.

11   Q.   And there was a confidential informant used in the case

12   that we're here for today, correct?

13   A.   That is correct.

14   Q.   And he worked under the supervision or with a handler or

15   someone from HSI?

16   A.   That is correct.

17   Q.   And would the person who he worked with, did you have an

18   opportunity to speak with him before today?

19   A.   Yes, ma'am.

20   Q.   And is it a male?

21   A.   Yes, ma'am.

22   Q.   And did he advise you that this is someone -- this is the

23   first time he's worked with this CI or has this CI been

24   utilized by law enforcement in the past?

25   A.   This CI has been utilized by law enforcement in the past.

1    Q.   And is this a CI that's working off any charges or is this
2    a CI that's being paid?
3    A.   This is a CI that I believe is being monetarily paid.
4    Q.   And is there any -- have you received any information that
5    leads you to believe that this CI has had any issues
6    since -- "issues" meaning problems working as a CI since
7    joining as a paid monitored CI?
8    A.   I have not received any problem information with regard to
9    this particular CI, no, ma'am.
10   Q.   And has this CI, to your understanding, been proven to be
11   reliable with information as provided and work that has been
12   done in the past?
13   A.   Yes, ma'am.
14   Q.   There was also what we refer to as a UC or undercover
15   officer used in this case, correct?
16   A.   Correct.
17   Q.   And there are some times where an undercover comes in
18   later in the game.  Do you know when in relation to this
19   investigation starting the undercover was introduced into this
20   investigation?
21   A.   I believe the undercover was introduced into this
22   investigation several weeks after the beginning of the
23   investigation.
24   Q.   Was the -- to your understanding, who was the confidential
25   informant first speaking with about deliveries of fentanyl?

1    A.    To my recollection, the confidential informant in this

2    investigation was speaking with a Mexican national who was a

3    drug supplier of narcotics into the United States.

4    Q.    And is it your understanding that the CI right from the

5    get-go brought this information to the undercover?

6    A.    That is correct.

7    Q.    Does that have anything to do with there being a language

8    barrier between the CI and this Mexican national?

9    A.    Yes, ma'am.

10   Q.    Does the CI speak fluent Spanish?

11   A.    The CI does not speak any Spanish.

12   Q.    So any conversations would have had to have been with the

13   Mexican national and someone who speaks Spanish, correct?

14   A.    Correct.

15   Q.    And did the undercover officer in this case speak fluid

16   Spanish?

17   A.    Yes, ma'am.

18   Q.    What were we talking about in terms of -- what was the

19   Mexican national saying in terms of the amounts that he wanted

20   to have sold into Massachusetts?

21   A.    The confidential informant, through the conversation with

22   the Mexican national, was advising that he wanted supplies of

23   fentanyl in the Massachusetts area.  The Mexican national was

24   indicating that he was going to be shipping approximately 28

25   kilos of fentanyl into that area in the very near future.

1   Q.   Did -- was there any investigation done or attempted into

2   whether this Mexican national, as we refer to him, was actually

3   real or maybe just imagining or playing pretend?

4   A.   I believe there was investigation done trying to identify

5   him, but it was not fruitful.

6   Q.   It was not fruitful?

7   A.   Correct.

8   Q.   So there's no identification that's been made at this

9   point?

10   A.   Correct.

11   Q.   And when you say 28 kilos, let's talk for a minute.  You

12   said that Lawrence is an area that you've seen, as a task force

13   officer, a large amount of fentanyl being sold into this area,

14   correct?

15   A.   That is correct.

16   Q.   What amounts are you generally seeing on the cases that

17   you're involved in?

18   A.   Well, the investigation that we operate, we tend to

19   investigate larger amount cases.  So we try to deal with kilos

20   or above.  We're seeing anywhere from multiple kilos to smaller

21   street level amounts depending on the investigation.

22   Q.   And when you say street level amounts, is there an amount

23   that's typical in terms of street level sales or are we talking

24   anywhere, you know, from one gram to how much?  Is there a

25   range?

1    A.    It varies, but in the fentanyl, what we're typically

2    seeing is fingers and above, which is ten grams of fentanyl and

3    above.

4    Q.    You just called it a finger?

5    A.    Correct.

6    Q.    And why is it referred to as that?

7    A.    Because it's packaged in like a finger-looking device, and

8    it's ten grams.

9    Q.    So that's generally what you're seeing of fentanyl is

10   those amounts?

11   A.    On street-level-wise, yes, ma'am.

12   Q.    Were you in Lawrence, Massachusetts on June 12th of 2019?

13   A.    Yes, ma'am.

14   Q.    That was last Wednesday?

15   A.    Correct.

16   Q.    Prior to that date, when did you become involved in the

17   investigation that ultimately led to the arrest of the

18   Defendant?

19   A.    Prior to the 12th, I was involved a day earlier, on the

20   11th, involving this direct investigation.

21   Q.    And in speaking with the undercover and reading some

22   preliminary reports, do you have an idea of when the

23   investigation actually began?

24   A.    Yes, ma'am.

25   Q.    When was that?

1    A.   I believe the investigation began at some point in May of

2    this year.

3    Q.   And what did it consist of prior to you becoming involved

4    on the 11th?

5    A.   The investigation to -- from my reading of the reports

6    consisted of May the CI was in contact with a Mexican national.

7    Once the CI started to establish this contact, conversations

8    were had with the controlling agent about the investigation.

9    It became more involved between the CI and the Mexican national

10   in the beginning of June.  There was some conversation had

11   around June 8th between the Mexican national, the CI, about --

12   and the UC about a narcotic delivery that we were trying to

13   request, and ultimately on June 11th we attempted to do this

14   narcotic transaction.

15   Q.   And when you talk about the communications or the

16   conversations between the Mexican national and the CI, after

17   the CI first told the undercover about it or HSI about it, was

18   the undercover present during any telephonic conversation

19   between the Mexican national and the CI?

20   A.   Prior to July -- June 11th I do not believe, no.

21   Q.   And phone conversations between the Mexican national and

22   either the CI or the UC, were those recorded?

23   A.   They were all recorded, yes, ma'am.

24   Q.   Have they yet been transcribed?

25   A.   They have not.

1    Q.    Those are in English or Spanish?

2    A.    They would be in Spanish, ma'am.

3    Q.    So those need to be translated into English and then

4    transcribed, correct?

5    A.    Correct.

6    Q.    But you've been given a general idea of what transpired

7    during those conversations, correct?

8    A.    Yes, ma'am.

9    Q.    But you don't have any specifics in terms of dates other

10   than what's in the report?

11   A.    Correct.

12   Q.    So let's -- let me ask you when did talk of a driver --

13   how much before June 11th did talk of a driver that was going

14   to be showing up with fentanyl start?

15   A.    I believe roughly around June 8th there was conversation

16   between the Mexican national and the UC and informant about a

17   driver that the Mexican national was going to be shipping up

18   this way getting arrested of some sort in New York, and then on

19   June 11th there was actual conversation with what the Mexican

20   national described as the driver of the drugs that would be

21   coming up for the transaction we were trying to put in motion.

22   Q.    So there was some conversation -- just to sort of put a

23   cap on that, there was some kind of conversation between the

24   Mexican national and the CI and the UC about a driver that

25   ultimately didn't make it because they got arrested in New

1  York?

2  A.   Correct.

3  Q.   And so the deal had to be pushed back because that driver

4  was no longer available?

5  A.   Correct.

6  Q.   At some point was talk of another driver raised by the

7  Mexican national?

8  A.   Yes, ma'am.

9  Q.   Do you know when that was?

10  A.   I believe that was on June 8th.

11  Q.   And was a deal scheduled to take place on June 8th at any

12  time?

13  A.   There was not.

14  Q.   How was the date of -- you said June 11th was the date it

15  was originally scheduled for, correct?

16  A.   Yes, ma'am.

17  Q.   How was that date picked?  Was there any reason for that

18  date?

19  A.   After the Mexican national was pushing for the June 8th to

20  be the day of the deal, which was on a weekend, tactically-wise

21  we decided to push for the beginning of the week, being the

22  Monday the 10th or Tuesday the 11th.  We would be able to use

23  Monday as putting the operation plan in place, June 11th being

24  the day of the operation.

25  Q.   So now let's get to the part that we really think is

1    involving Mr. Mejia-Nunez.  When did the confidential informant

2    or the undercover first begin communications with what they

3    knew to be the driver?

4    A.    That would be on June 11th.

5    Q.    And how was it that they got in touch with each other?

6    A.    The confidential informant had provided his number to the

7    Mexican national, who in turn provided that number to what we

8    found out to be the driver.  That driver contacted the

9    confidential informant and the UC on June 11th in the

10   afternoon.

11   Q.    And when did law enforcement think or want the deal to

12   take place on June 11th?

13   A.    That early afternoon, June 11th.

14   Q.    So during the conversation, let's say the first

15   conversation between the CI and the UC and this driver, was

16   there any discussion about whether the deal could actually take

17   place on June 11th in the middle of the day or the early

18   afternoon?

19   A.    There was.

20   Q.    And what was that?

21   A.    The conversation was through the undercover officer and

22   the driver on the other end, that the driver was six hours away

23   and was not in the area at the time, said it would be five or

24   six hours before we could do the deal.  Based on that

25   conversation, we decided as law enforcement to tactically move

1    the operation from that date to push till the next day, and we

2    pulled the plug on June 11th.

3    Q.   And was the -- was there communications between the

4    undercover and the driver that -- let's just do this tomorrow?

5    A.   Correct.

6    Q.   Did the driver at any time say where they were coming

7    from?

8    A.   He said -- the conversation between the UC and the driver,

9    the UC, when he heard five hours, asked are you in New York.

10   The driver said yes.

11   Q.   Was there any talk between the driver, the UC or the CI

12   about what the driver was bringing?

13   A.   Yes.

14   Q.   And what was that?

15   A.   The conversation between the UC and the driver was are you

16   bringing me fentanyl?  He said yes.  He asked how many.  And

17   the actual conversation was the driver said I'm bringing five

18   vehicles, "vehicles" being the code word for kilograms of

19   fentanyl.

20   Q.   How do you know that?  You say that like you know that

21   "vehicles" would be the code word.  Is there a reason why you

22   know that in this case in particular?

23   A.   It's common in narcotic investigations, through training

24   and experience, that either distributors or -- distributors of

25   narcotics would use code words because they don't want to use

1    the actual language on the telephone in case the telephone is

2    being intercepted.

3    Q.   So based on the context, you believe that that was a term

4    for kilos?

5    A.   Correct.

6    Q.   Was there any talk -- you had said earlier about 28 kilos?

7    A.   Yes, ma'am.

8    Q.   Was there any talk between the driver and the UC and the

9    CI about a larger amount?

10   A.   I don't recall that, no.

11   Q.   At any point did the driver indicate that he was going to

12   be bringing any more than five?

13   A.   He did not.

14   Q.   So were there several conversations throughout the course

15   of the 11th where ultimately the deal was scheduled to take

16   place on the 12th?

17   A.   Correct.

18   Q.   And let's now move to the 12th.  Did the driver make

19   contact or did the CI or UC make contact with the driver?  Do

20   we know which direction it came from on the 12th?

21   A.   Yes, ma'am.  Ultimately on the 12th, the early morning of

22   the 12th, the driver attempted to contact the undercover.  The

23   undercover in turn called that driver back and pushed for late

24   in the afternoon, for after 11:00, because he was in the

25   process of trying to arrange a hotel to do the deal at, et

1   cetera, and said he'd be calling him back shortly.

2   Q.   Now let me just -- because I left this out, let me just go

3   back to some of the conversations between the UC, CI, and the

4   Mexican national.  Was there a discussion about how much the CI

5   and UC were going to be paying per kilogram?

6   A.   Yes, ma'am.

7   Q.   And what was that amount?

8   A.   Ultimately the price agreed upon was going to be $40,000

9   per kilo.

10  Q.   So for the five kilos that the driver said he was

11  bringing, how much was expected to be paid on that date?

12  A.   What was expected to be paid was $200,000.

13  Q.   And so the -- on the 12th when they finally did connect,

14  the driver having called and then the UC calling back, what

15  time was the deal ultimately scheduled for?

16  A.   The deal was ultimately scheduled at around noontime, to

17  be completed around 12:30, 12:15, somewhere in that area.

18  Q.   Was there any indication from the driver about how long it

19  had taken them to get there, what time they left, anything like

20  that at any point?

21  A.   Not that I'm aware of, no, ma'am.

22  Q.   Did -- when they ultimately made contact on the 12th, was

23  the -- did the driver indicate that he was already in the

24  Lawrence area?

25  A.   Correct.  The driver said he would be 15 minutes away.

```
 1   Q.   And how was the -- how was the decision made on where the
 2   meeting would take place?
 3   A.   The decision was made by law enforcement for tactical
 4   reasons.  The day prior we had it at one hotel, we moved it to
 5   a different hotel.  And it was going to be at the Sonesta Hotel
 6   parking lot.
 7   Q.   So originally when it was to take place on the 11th it was
 8   at one hotel, why did you move it when you were now doing it on
 9   the 12th?
10   A.   We moved it for tactical reasons because the Defendant or
11   the driver was aware of that location.  We didn't want that
12   location to be the same location for purposes of possible
13   counter surveillance, et cetera.
14   Q.   And for tactical reasons, do you sort of hold off on
15   providing that location until shortly before the deal takes
16   place?
17   A.   Correct.
18   Q.   In this particular situation was an address ultimately
19   provided to the driver of where to go?
20   A.   Yes, ma'am.
21   Q.   And how soon before the actual deal was that?
22   A.   That was roughly at around noontime, 15 minutes prior to
23   when we were expecting to do the deal.
24   Q.   And was there discussion -- did the driver indicate what
25   he would be driving?
```

1    A.   Yes, ma'am.

2    Q.   What did he say?

3    A.   The driver indicated earlier in the day that it would be

4    either a gold or a blue vehicle.  The final conversation had

5    the driver indicated he was in a gold vehicle.

6    Q.   Was there any discussion about another vehicle coming

7    along with the driver?

8    A.   Yes, ma'am.

9    Q.   When -- was that a conversation prior to the deal?

10   A.   Yes, ma'am.

11   Q.   What did the driver ultimately say about there being

12   another vehicle?

13   A.   The driver indicated that the CI was to walk up to the

14   gold vehicle and the money was to go into the blue vehicle.

15   Q.   And were there any questions about why two vehicles or

16   who's in the other vehicle or not?

17   A.   No, ma'am.

18   Q.   When the deal was ultimately to take place, had there been

19   communications from the UC to the driver about where the UC

20   would be while the CI met with the driver?

21   A.   Yes, ma'am.

22   Q.   Where was the UC supposed to be?

23   A.   The conversation between the UC and the driver were that

24   the UC would be within a hotel room awaiting the observation of

25   the informant to see the drugs.  Once the informant was to see

1  the narcotics, the informant was to call the UC, who in turn

2  would bring the money down to the actual transaction.

3  Q.   And for purposes of law enforcement, was the CI ultimately

4  instructed to make a call once he saw drugs?

5  A.   Yes, ma'am.

6  Q.   Prior to arriving at the -- you said the Sonesta?

7  A.   Yes, ma'am.

8  Q.   Was the confidential informant searched?

9  A.   Yes, ma'am.

10  Q.   And why is that done?

11  A.   That's done for continuity-wise, to make sure the

12  informant has not brought any narcotics themselves to the

13  location.

14  Q.   Was there anyone else in the car with the CI when

15  they -- when he drove to the -- arrived at the Sonesta?

16  A.   Yes, ma'am.

17  Q.   And was that another CI that's utilized by HSI?

18  A.   That is correct.

19  Q.   Other than being in the passenger seat, did that other CI

20  have anything at all to do with this case?

21  A.   Zero.

22  Q.   Did that CI have anything to do with the deal and the

23  ultimate takedown that day?

24  A.   Absolutely nothing, ma'am.

25  Q.   Do you know why that other CI was in the car with the

1    first CI?

2    A.    These two particular CIs work in conjunction on a lot of

3    the investigations that we have them utilized for.

4    Q.    And are they known sort of for running together?

5    A.    Correct.

6    Q.    So other than the CI being searched, was this second CI

7    also searched?

8    A.    Yes, ma'am.

9    Q.    And was that by a law enforcement officer with other law

10   enforcement officers witnessing it?

11   A.    Yes, that's correct.

12   Q.    What about the car; what was -- was the car searched?

13   A.    The car would be searched -- the car was searched by the

14   same officers that the CIs utilized from the meeting location

15   to the actual deal location.

16   Q.    And was law enforcement eyes ever taken off that car?

17   A.    No, ma'am.

18   Q.    So it's understood that by the time the CI gets to the

19   Sonesta, they have no drugs on them?

20   A.    Correct.

21   Q.    Once the CI's car is in the Sonesta, is there conversation

22   with the driver about exactly where in the parking lot the CI

23   was?

24   A.    Yes, ma'am.

25   Q.    And ultimately did law enforcement have a view of sort of

1    what was happening?

2    A.    Yes, ma'am.

3    Q.    When -- and a car was ultimately seen, a gold car was

4    ultimately seen driving into the parking lot, right?

5    A.    Correct.

6    Q.    Was that gold car followed by any other car?

7    A.    It was followed by a small blue sedan.

8    Q.    And did they sort of ride in tandem with each other?

9    A.    Correct.

10   Q.    And once they, the blue car -- the gold car and the blue

11   car got to the general area where the CI's car was, what did

12   the CI do?

13   A.    The CI then walked from the CI vehicle over to the gold

14   vehicle, at which time he had conversation with the operator of

15   the gold vehicle.

16   Q.    And the operator of the gold vehicle, was the driver still

17   sitting behind the wheel?

18   A.    Was sitting in the front driver's seat, correct.

19   Q.    Was the door open or closed?

20   A.    The door was opened -- the door was closed.  Excuse me.

21   Q.    Was the window down?

22   A.    Yes, ma'am.

23   Q.    And was there any discussion between the CI and the driver

24   at that point?

25   A.    Yes, ma'am.

1    Q.   Was the CI wired for recording so that any conversation

2    that took place at that point is recorded?

3    A.   The CI was in fact wired, yes, ma'am.

4    Q.   And so what have you been led to believe was the

5    conversation between the CI and the driver at that point?

6    A.   The CI approached the driver and asked if the driver had

7    the kilograms of fentanyl.  The driver said yes.  He says how

8    many do you have.  The driver said five.  He asked if it was

9    all China White.  "China White" being the code word for

10   fentanyl.  The driver said yes, all five.

11   Q.   And you say China White being the code word for fentanyl,

12   how is that -- is that a common street term for fentanyl?

13   A.   It's a common term used in law enforcement as well as

14   street level, yes, ma'am.

15   Q.   Is the term "China White" used to refer to any other type

16   of drug other than fentanyl?

17   A.   No, ma'am.

18   Q.   When the CI asked the driver if it was China White, did

19   the driver indicate that they didn't know what that meant or

20   that they were confused or sort of shrugged their shoulders,

21   any indication that they didn't understand?

22   A.   The driver -- when he asked for China White, the driver

23   said yes.

24   Q.   And then he asked all of it, and what did the driver say?

25   A.   The driver said yes.

1  Q.   At that point did the -- was there any discussion about

2  the CI seeing these drugs?

3  A.   The CI asked to see the drugs.  The driver in turn reached

4  back behind the driver's seat to the passenger seat -- the rear

5  passenger seat behind it, removed the black jacket which was

6  sitting on top of a black canvas-style duffel bag, opened the

7  duffel bag, and inside the CI observed what appeared to be a

8  wrapped kilogram of narcotics.

9       MS. STEINBERG:  Your Honor, may I approach the

10  witness?

11       THE COURT:  Yes.

12  Q.   I'm handing you what has already been entered into

13  evidence for purposes of this hearing as Government's Exhibit

14  1, which consists of a composite exhibit of photographs labeled

15  Government's Exhibit 1A to Government's Exhibit 1P, and if you

16  could just look through -- look at those, and just let me know

17  if you've had a chance to look at them before today?

18  A.   Yes, ma'am.

19  Q.   So I'm directing your attention to Government's Exhibit

20  1A.  Is that the black canvas bag that you just spoke of?

21  A.   That is correct.

22  Q.   Were you on scene at this point?

23  A.   Yes, ma'am.

24  Q.   Were you one of the law enforcement officers who was in a

25  position to sort of surveil what was happening when the CI

1    first walked up to the driver's car?

2    A.    I was not, no, ma'am.

3    Q.    Were you one of the first people to -- strike that.

4            Were you told that this is the way the bag looked

5    once the jacket was removed from it by the driver?

6    A.    I was one of the first individuals on the actual vehicle

7    for the takedown, and that is how the bag appeared when we

8    opened the vehicle.

9    Q.    Okay.  So going back to where we just were, the CI asked

10   to see the drugs, the driver turns around and removes a jacket

11   from the seat behind him?

12   A.    Correct.

13   Q.    And there's this black canvas bag that appears to be

14   unzipped; is that correct?

15   A.    Correct.

16   Q.    And what did the CI do at that point upon seeing that bag?

17   A.    The CI stepped away from the vehicle to call the UC under

18   the guise of bringing down the money, advised the UC that he

19   had seen the drugs in the vehicle.  The UC gave the signal over

20   the radio and the communications to execute, at which time we

21   pulled up and effected an arrest of the individual.

22   Q.    So you just said that the CI contacted the UC to say I saw

23   the drugs.  Are the drugs or any part of the drugs visible to

24   your knowledge, since you were one of the first people to get

25   up to the car, from the outside looking in?

1    A.    Yes, ma'am.

2    Q.    And why is that?  How is it packaged such that it could be

3    seen?

4    A.    Because the bag was open as is depicted in the picture

5    here, and inside the opened zippered area you could see a

6    wrapped kilogram of a narcotic.

7    Q.    So referring your attention -- directing your attention to

8    Government's Exhibit 1B, is that one of the kilos that you are

9    talking about?

10   A.    Correct.

11   Q.    It looks like it has a greenish tint to it, correct?

12   A.    Greenish blue tint, correct.

13   Q.    So the CI calls the UC under the guise of I saw the drugs.

14   You can bring the money down; is that correct?

15   A.    That is correct.

16   Q.    And that ultimately signals the takedown?

17   A.    Correct.

18   Q.    And you now said you were one of the first people on scene

19   at the car; is that correct?

20   A.    That is correct.

21   Q.    Were you all given responsibilities about who does what,

22   like you're in charge of the car, someone else is in charge of

23   taking the driver into custody?  How did that work?

24   A.    It depends on how quickly we get out of the vehicle and

25   who's first.  Obviously to detain the driver is the first and

1   foremost thing to do, and then anyone else that might be

2   present, to detain them for officer safety reasons.

3   Q.   Was there anyone else in the car other than the driver?

4   A.   No, ma'am.

5   Q.   And when you arrived on scene up at the car, did you have

6   an opportunity to look at the driver?

7   A.   Yes, ma'am.

8   Q.   And do you recognize the person you saw sitting in the

9   driver's seat of that gold vehicle that day sitting in the

10  courtroom today?

11  A.   Yes, ma'am.

12  Q.   And if you could please point him out by something he's

13  wearing.

14  A.   Sure.  He's the gentleman sitting at the table with the

15  green jumpsuit on.

16          MS. STEINBERG:  Your Honor, may the record reflect

17  that the witness has identified the Defendant.

18          THE COURT:  So reflected.

19          MS. STEINBERG:  Thank you.

20  Q.   So the driver is taken into custody; is that correct?

21  A.   That is correct.

22  Q.   Is he placed under arrest at that point?

23  A.   He is.

24  Q.   And are his Miranda rights read to him immediately upon

25  scene?

1    A.    Yes, ma'am.

2    Q.    Are they read to him in English or Spanish?

3    A.    They are read to him in Spanish.

4    Q.    And it was understood that the driver had been speaking

5    Spanish throughout their communications, correct?

6    A.    That is correct.

7    Q.    Was the -- were the Miranda rights read to the Defendant

8    off like a Miranda sheet or a Miranda card as we refer to them?

9    A.    Yes, ma'am.

10   Q.    And was the Defendant asked if he would sign that form?

11   A.    Yes, ma'am.

12   Q.    And speak to law enforcement?

13   A.    Yes, ma'am.

14   Q.    And did he agree?

15   A.    He did.

16   Q.    And did he sign the form?

17   A.    Yes, he did.

18         MS. STEINBERG:  May I approach, Your Honor?

19         THE COURT:  Yes.

20   Q.    Showing you Government's Exhibit 4, is that, to your

21   knowledge, the Miranda form that was read to the Defendant in

22   Spanish and ultimately signed by the Defendant?

23   A.    This is -- yes, it is, ma'am.

24   Q.    You said you were one of the first people on -- like, to

25   look in the car.  So tell the Court what you saw when you got

1   up to the car.

2   A.    As we exited the takedown vehicle that I was in, we

3   approached the car.  The van was parked in the left lane.

4   There was a center lane that was open, and the blue vehicle was

5   one lane over.  I immediately ran to the driver -- the

6   passenger side window, drawing down on the suspect, who was

7   sitting in the passenger seat who had his hands up.

8   Q.    The passenger seat or the driver?

9   A.    Driver seat, excuse me.  Had his hands up.  There was an

10  officer in front with a position on the driver as well.  He was

11  then pulled from the vehicle and patted down and placed into

12  handcuffs in that location.

13  Q.    Did he have any weapons on him or in the vehicle?

14  A.    He did not.

15  Q.    Did -- in looking at the bag, you had said you were able

16  to confirm what the CI had seen; is that correct?

17  A.    That is correct.

18  Q.    So what did you see?

19  A.    I turned, looked through the passenger side rear window --

20  or actually opened the door.  Inside I could see the black

21  duffel bag sitting there open, and I could see what appeared to

22  be a kilogram wrapped in greenish blue and clear cellophane.

23  Q.    And ultimately were the items that were inside that black

24  canvas bag removed from the bag?

25  A.    They were.

```
 1   Q.    And how many of these brick-shaped objects were inside the
 2   bag?
 3   A.    There was five individually wrapped bricks of suspected
 4   narcotics.
 5   Q.    And Government's Exhibit 1D, does that reflect the five
 6   with three in one pile and two in the other?
 7   A.    That is correct.
 8   Q.    And, again, you are seeing that green tint.  Can you tell
 9   the Court, to your knowledge, what that is?
10   A.    That green tint is -- blue and green is different colored
11   wrappings that they use to wrap up the narcotics inside, and
12   then it's wrapped in clear cellophane over that.
13   Q.    Now, normally -- well, I should say customarily, when a
14   drug deal takes place and law enforcement ultimately comes into
15   contact by buying drugs from someone who is selling them, are
16   there field tests that are conducted?
17   A.    Yes, ma'am.
18   Q.    And is that done to confirm what the drug is?
19   A.    Yes, ma'am.
20   Q.    Is that being done, normal field tests, in fentanyl cases?
21   A.    It is not.
22   Q.    And why is that?
23   A.    One, it is HSI policy throughout the nation not to test
24   for -- test for fentanyl as well as the dangerousness of the
25   drug itself.  They advise not to.
```

1    Q.    Have there been incidents, to your knowledge, where people

2    have actually died from just coming into contact, by being

3    around it, once it's opened?

4    A.    Yes, ma'am.

5    Q.    And K-9 officers have died by sniffing it, correct?

6    A.    Correct.

7    Q.    Is there a machine that you know of as a TruNarc?

8    A.    Yes, ma'am.

9    Q.    What is that?

10   A.    It was a machine that was utilized by law enforcement that

11   fires a laser beam into the narcotic, and it registers as to

12   what the narcotic is.

13   Q.    And can the TruNarc machine be used when there is any kind

14   of colored wrapping on top of the drugs?

15   A.    It is advised not to use that for any kind of dark colored

16   wrapping on any kind of wrapping of a narcotic.

17   Q.    So based on that advisement and the fact that it couldn't

18   be opened, were -- was any of these -- were any of these kilos

19   field tested?

20   A.    They were not.

21   Q.    So our understanding of it being fentanyl is based on the

22   conversations that were had between the driver and the CI and

23   the UC and the Mexican national?

24   A.    Correct.

25   Q.    Is it also based on the price; is $40,000 per kilo an

1    unusual amount for fentanyl?

2    A.    It's actually a good price.

3    Q.    So I'm going to stick with the car before we move back to

4    the Defendant.  I'm showing you Government's Exhibit -- please

5    look at Government's Exhibit 1F.  So those were all the

6    kilograms that are being weighed; is that correct?

7    A.    Yes, ma'am.

8    Q.    And it's about 5,800 grams?

9    A.    Correct.

10   Q.    So that includes obviously whatever is in those wrappings

11   but also the wrappings?

12   A.    That is correct.

13   Q.    Now, in searching the car, did you find any cell phones?

14   A.    Yes, we did.

15   Q.    How many?

16   A.    I believe there was four cell phones that were located.

17   Q.    Let's -- I'm going to show you some pictures, and I want

18   to go through them with you, if we could.

19   A.    Okay.

20   Q.    In looking at Government Exhibits 1I and J, was that one

21   of the phones found in the car?

22   A.    Yes, ma'am.

23   Q.    And that appears to be like a pink or a rose gold

24   iPhone --

25   A.    Yes, ma'am.

1    Q.   -- is that correct?

2          Were you ever given any indication of what this phone

3    was used -- what the driver used this particular phone for?

4    A.   Yes, ma'am.

5    Q.   What?

6    A.   This phone was the phone that the UC and the CI were

7    communicating with the driver with.

8    Q.   Okay.  Turning to Government's Exhibit 1K, that's a

9    Samsung.  It appears to be blue in color; is that correct?

10   A.   Correct.

11   Q.   In looking at the camera on the back, the camera looks as

12   though it's in -- the viewer, I don't know what you call it, is

13   in a vertical position, correct?

14   A.   Correct.

15   Q.   So now turning to Government's Exhibit 1L, does that

16   appear to be a different Samsung based on the angle?

17   A.   Yes, ma'am.

18   Q.   So that's three.  Government's Exhibit 1M, that is an LG.

19   Is that a phone you found in the car?

20   A.   That is correct.

21   Q.   And 1N, that has a serial number that starts with 905; is

22   that correct?

23   A.   That is correct.

24   Q.   And if you look at Government's Exhibit 1O, that's an LG

25   as well, correct?

1    A.    Yes, ma'am.

2    Q.    And turning to 1P, if you look at the serial number on

3    that one, the serial number actually starts with the number

4    902, correct?

5    A.    Correct.

6    Q.    So there were actually five cell phones in the Defendant's

7    car, correct?

8    A.    Yes, ma'am.

9    Q.    What type of license plate was on the gold car, what

10   state?

11   A.    There was a Pennsylvania license plate affixed to the

12   vehicle.

13   Q.    And was the Defendant's driver's license ultimately seized

14   by law enforcement?

15   A.    Yes, ma'am.

16   Q.    And is that Government's Exhibit 1H -- I'm sorry.  I take

17   that back -- 1G?

18   A.    Yes, ma'am.

19   Q.    And that was taken off the Defendant's person?

20   A.    That is correct.

21   Q.    And the 1H, that appears to be a Dominican Republic voter

22   card of some type, electoral -- I'm not sure.  Cedula, is that

23   what that is?

24   A.    Yes, ma'am.

25   Q.    And that was also found on the Defendant?

1    A.    Yes.

2    Q.    The blue car, was the blue car -- who was the blue car

3    driven by?

4    A.    The blue car was driven by a Hispanic female, a younger

5    Hispanic female.

6    Q.    And did the driver at any point indicate who that was?

7    A.    Yes, ma'am.

8    Q.    Who?

9    A.    The driver of the gold vehicle indicated that the operator

10   of the blue vehicle was in fact his niece.

11   Q.    And did the driver indicate why she was there in that blue

12   car?

13   A.    The driver had indicated that the money was supposed to go

14   into that blue vehicle.

15   Q.    Other than this younger Hispanic female was there anyone

16   else in the blue car?

17   A.    Yes, ma'am.

18   Q.    Who?

19   A.    The Hispanic female had her five- or six-year-old son in

20   the vehicle with her.

21   Q.    And where was this son in the vehicle?

22   A.    He was seated in the back seat.

23   Q.    In a car seat?

24   A.    No, ma'am.

25   Q.    Was the female questioned on scene?

1  A.   Yes, she was.

2  Q.   Did she indicate that she had any knowledge of why she was

3  there?

4  A.   She indicated that her uncle had asked her to come with

5  her, but she had no knowledge -- she indicated she had no

6  knowledge of any kind of narcotic-related incident going on.

7  Q.   So basically the Defendant, her uncle, had asked her to

8  come to this drug deal with him; is that right?

9  A.   Yes, ma'am.  Yes, ma'am.

10 Q.   And had she been told anything about whether something was

11 going to be put in her car?

12 A.   She did not indicate that, no.

13 Q.   Okay.  But the driver had indicated that to you, correct?

14 A.   Yes, ma'am.

15 Q.   And he had said what again?

16 A.   That the money was to go into the blue vehicle.

17 Q.   And how much money was that?

18 A.   $200,000.

19 Q.   Was the female -- do we have any evidence on scene that

20 the niece knew any more than she was saying, that she basically

21 knew nothing?

22 A.   That is correct, we had no evidence, no, ma'am.

23 Q.   Was she asked if -- was she asked where she's from?

24 A.   Yes, ma'am.

25 Q.   And where is she from?

1   A.   She is from Lawrence.

2   Q.   So she actually lives in Lawrence?

3   A.   That is correct.

4   Q.   Where did the Defendant say he was from?

5   A.   The Defendant said he was from Pennsylvania.

6   Q.   And did he say when he -- when he picked up his niece?

7   A.   The Defendant said -- the Defendant had indicated he was

8   driving up the morning of the 12th for -- to complete the

9   narcotic transaction.

10   Q.   And since the niece showed up at the deal, you would

11   assume it was sometime after he arrived and when he showed up

12   at the deal; is that correct?

13   A.   Correct.

14   Q.   Was the niece asked if she would consent to her home being

15   searched given that it was close to the takedown location?

16   A.   Yes, ma'am.

17   Q.   And why was she asked that?

18   A.   The niece was asked about searching her location because

19   that location had been identified sometime between Saturday and

20   the 11th as a location that the Defendant was staying at.

21   Q.   Okay.  So I want to ask you about that, because you just

22   said that the driver drove to Lawrence from wherever he was

23   coming from -- he said he was five or six hours away -- the

24   morning of the 12th, correct?

25   A.   Correct.

```
 1   Q.   So did law enforcement have information that the driver

 2   had actually been there previously?

 3          MR. ERKAN:  Objection, Judge.  Just the basis of the

 4   information.

 5          THE COURT:  I think she just asked him did he have any

 6   basis, right, or did I --

 7          MS. STEINBERG:  Yes, Your Honor.

 8          MR. ERKAN:  Oh, I'm sorry.  I thought she asked

 9   about -- I withdraw the objection.

10          THE COURT:  Okay.  All right.

11   A.   Law enforcement -- we had been advised on the Saturday the

12   Mexican national indicated that they wanted to move the drugs

13   on Saturday the 8th, and the drugs were already in the area.

14   Q.   And how was it that that address was identified?

15   A.   It was passed from -- it was passed through the UC/CI

16   somehow.

17   Q.   Do you know who from who?

18   A.   I do not.

19   Q.   Do we have any knowledge --

20          MR. ERKAN:  I object to that, and I move to strike,

21   then, Judge.

22          MS. STEINBERG:  I'm going to follow up.  I think I can

23   clear it up.

24          THE COURT:  All right.  So go ahead.

25   Q.   Do we have any knowledge, other than that loose
```

1    information, that that house had anything to do with this drug

2    deal?

3    A.    No, ma'am.

4    Q.    And is one of the reasons that you asked for consent to

5    search it was to verify that -- what the niece was telling you?

6    A.    Correct.

7    Q.    And nothing was found in the house, correct?

8    A.    That is correct.

9    Q.    And based on that, what decision was made about the niece?

10   A.    The decision was made not to arrest the niece on any

11   charges that day related to the narcotic transaction.

12   Q.    And as we sit here today, we do not have any evidence that

13   the niece is or was involved?

14   A.    Correct.

15   Q.    Once the Defendant was removed from the car and read his

16   Miranda rights and signed the form, was he ultimately

17   transported to a police department somewhere in the area?

18   A.    Yes, ma'am.

19   Q.    Where was that?

20   A.    Andover Police Department.

21   Q.    And was an interview conducted of him given he had said

22   he'd be willing to speak to law enforcement?

23   A.    Yes, ma'am.

24   Q.    Was that recorded?

25   A.    It was audio recorded, yes, ma'am.

1    Q.    And is it in English or Spanish?

2    A.    It is in Spanish, ma'am.

3    Q.    And it has not been transcribed yet, correct?

4    A.    That is correct.

5    Q.    Have you had an opportunity to read a report that reflects

6    the summary or substance of what was said during that

7    interview?

8    A.    Yes, ma'am.

9    Q.    So let's start by asking, was the Defendant reread his

10   Miranda rights?

11   A.    Yes, he was.

12   Q.    And he continued to agree that he'd be willing to speak to

13   law enforcement; is that correct?

14   A.    That is correct.

15   Q.    If you could summarize what types of questions was he

16   asked.  Was he asked biographical information, like name, date

17   of birth, Social Security, things like that?

18   A.    Yes, ma'am.

19   Q.    What did he say about his -- where he's from originally?

20   A.    The Defendant originally stated he was from the Dominican

21   Republic.

22   Q.    Did he say he was here lawfully in the United States?

23   A.    Yes, ma'am.

24   Q.    And how long had he been in the United States according to

25   him?

1    A.   He said he'd been in the United States since 2003.

2    Q.   Did he indicate where he had slept the previous night, the

3    night before the deal?

4    A.   To the best of my recollection, he indicated he slept in

5    Pennsylvania at home with his wife.

6    Q.   And he indicated he had left early that morning from

7    Philadelphia?

8    A.   That's correct.

9    Q.   Did he say where he went to first from Philadelphia?

10   A.   He indicated he stopped in New York first and met an

11   unknown Mexican in a Dunkin' Donuts parking lot.

12   Q.   And what happened in the Dunkin' Donuts parking lot?

13   A.   He indicated the Mexican handed him the bag of what

14   contained the five kilograms of suspected narcotics, and he in

15   turn left New York and came to the Lawrence, Mass., Andover

16   area.

17   Q.   So was he asked at that point did he know what was in the

18   five that he kept talking about?

19   A.   Yes, ma'am.

20   Q.   What did he say?

21   A.   He indicated he thought it was drugs.  He didn't know what

22   kind of drug it was.

23   Q.   Did he -- did he use a word to refer to like a white drug,

24   like "perico" or something?

25   A.   Yes, ma'am.

```
 1   Q.    And do you know what that means?

 2   A.    No, ma'am.

 3   Q.    What was he -- what did he tell law enforcement about how

 4   he became involved in this activity?

 5   A.    He said that he was an Uber driver, and somebody that he

 6   had given an Uber ride to asked if he wanted to make some money

 7   on the side and offered him to transport drugs to the

 8   Northeast, to Massachusetts.  He'd be paid $5,000.

 9   Q.    So he said he -- he, the driver, the Defendant, worked as

10   an Uber driver?

11   A.    Correct.

12   Q.    Did he say in Pennsylvania, was it near where he lives?

13   A.    I believe it was Pennsylvania, ma'am.

14   Q.    And any idea who this unknown person is?  Was it a fare he

15   picked up, an Uber fare he picked up?

16   A.    Yes, ma'am.

17   Q.    And this unknown fare just asked him if he wanted to

18   transport drugs?

19         THE COURT:  So, Ms. Steinberg, maybe we could

20   streamline the questioning.  I'm not sure that has much to do

21   with either probable cause or detention.

22         MS. STEINBERG:  That's fine, Your Honor.  I didn't

23   know with the probable cause how much detail, but I can

24   absolutely do that.

25   Q.    Did -- so other than that he received these five -- this
```

1   bag containing five of what he knew to be drugs, that's all

2   that happened in the Dunkin' Donuts parking lot, correct?

3   A.   Yes, ma'am.

4   Q.   And then he drove?

5   A.   Yes, ma'am.

6   Q.   But he indicated he knew how much it was --

7   A.   Yes, ma'am.

8   Q.   -- five kilos?

9        He also reiterated that his niece knew nothing about

10  it, correct?

11  A.   Correct.

12  Q.   And did he indicate when he was going to be paid the

13  $5,000 that he had been promised?

14  A.   I believe he was to take the $5,000 from the money that

15  was being paid.

16  Q.   Do you know that for sure or that's just what you --

17  A.   That's the best of my recollection, ma'am.

18  Q.   Did he indicate that the person in New York had given him

19  a phone or that he had gotten a new phone for this deal,

20  anything like that?

21  A.   The Mexican national had indicated not to -- advised the

22  new -- give the information to the driver of the vehicle

23  because they changed phones after every deal.

24  Q.   Did the Defendant say whether he had ever done this

25  before?

1    A.    He did not.

2    Q.    Did he -- do you have any information that he has done

3    this before?

4    A.    I do not.

5    Q.    And now I just briefly want to show you what's already

6    been entered as Government's Exhibits 2 and 3.  They don't

7    really have names on them so I'm just going to refer to them by

8    their exhibit names, but did you have an opportunity to review

9    these prior to court today?

10   A.    Yes, ma'am.

11          MS. STEINBERG:  And may I approach, Your Honor?

12          THE COURT:  Yes.

13   Q.    I'm handing you Government's Exhibits 2 and 3.  And if you

14   could just quickly look at them and tell the Court have

15   you -- prior to a half hour before court, had you ever seen

16   those before?

17   A.    I had not.

18   Q.    And are these documents that you're familiar with as a

19   task force officer with HSI?

20   A.    I am not, no.

21   Q.    Did you have an opportunity, though, to read them before

22   you came to court?

23   A.    Yes, ma'am.

24   Q.    And the Government's Exhibit 2, it is called an I-213

25   narrative, and it appears to be created in 2013.  Did you have

 1    an opportunity to read that narrative that starts down at the

 2    bottom of the first page?

 3    A.   Yes, ma'am.

 4    Q.   And in that narrative does it talk about how the Defendant

 5    originally came into the United States?

 6    A.   Yes, ma'am.

 7    Q.   And there's a lot of information in there that ultimately

 8    is confirmed by the Defendant himself on January 26th of

 9    2013 --

10    A.   Correct.

11    Q.   -- is that correct?

12         And is that because there was a sworn statement taken

13    of the Defendant under oath?

14    A.   There was -- that is correct on that date, yes, ma'am.

15    Q.   And if you could just tell the Court very briefly what

16    information the Defendant gave in that interview that

17    ultimately is confirmed by the documents that we're looking at

18    in Governments Exhibits 2 and 3?

19    A.   Yes, ma'am.  The Government Exhibits 2 and 3 are

20    immigration-related documents.  Exhibit 2 being the January

21    of '13, the Defendant was stopped coming in through immigration

22    into JFK Airport in New York.  During that time he was pulled

23    aside for a secondary inspection, and under oath he gave a

24    sworn statement indicating that he was a legal permanent

25    resident in the United States.  That he actually snuck into the

1   United States in October of 2003 at the Southwest border from

2   Mexico.  While in the United States he married a woman,

3   obtained fake immigration-related documents for $2,500 in the

4   Dominican Republic.  Based on those fake papers, he obtained a

5   legal permanent residence status using this fake information

6   until he was stopped on the stop he was interviewed on in 2013.

7   Based on that, he was charged for the fake documents and went

8   before an immigration judge on obtaining these fake documents

9   and fake IDs.

10  Q.   When you say he was charged, he wasn't charged by the U.S.

11  Attorney's Office federally, correct?  He was charged in

12  immigration court?

13  A.   In immigration court, yes, ma'am.

14  Q.   And he was subject to removal proceedings at that point?

15  He was taken into custody that day, correct?

16  A.   Correct.

17  Q.   And, again, when he said he had originally come over the

18  Mexico/U.S. border in 2003, he said that was without

19  inspection.  He had just snuck over?

20  A.   Correct.

21  Q.   And at some point married this U.S. citizen.  Do you know,

22  is he still married to her?

23  A.   I do not know.

24  Q.   And he then at some point applied for status through his

25  U.S. citizen wife, who sponsored him?

1    A.   Correct.

2    Q.   And he needed documents for that, correct?

3    A.   Correct.

4    Q.   And he said he got the documents, you said, from the

5    Dominican Republic?

6    A.   Correct.

7    Q.   How much did he pay for those documents?

8    A.   $2,500.

9    Q.   And he admitted they were fraudulent.  He knew they were

10   fraudulent when he bought them and when he received them,

11   correct?

12   A.   That is correct.

13   Q.   Did it consist of a passport, a visa and a stamp?

14   A.   Correct.

15   Q.   He admitted that he used those three fraudulent documents

16   to ultimately gain lawful permanent residence status, correct?

17   A.   That is correct.

18   Q.   And from reading the reports, does it show when he

19   obtained that status?  Was it in 2009?

20   A.   Two thousand -- the wife (inaudible) for him in 2008, and

21   it appears in about 2009 he got that status, correct.

22   Q.   And it wasn't until he was stopped in 2013, there was some

23   flag or he was on some watch list?

24   A.   Correct.

25   Q.   And it was a watch list because somehow it was found out

1    that he used fraudulent documents to get his status into the

2    United States, correct?

3    A.   That is correct.

4    Q.   And throughout this period of time when he was using

5    these -- his status as a legal permanent resident based on

6    these fraudulent documents, was he going back and forth to the

7    Dominican Republic --

8    A.   Yes, ma'am.

9    Q.   -- twice -- a couple times a year?

10   A.   Twice a year, yes, ma'am.

11   Q.   And having no problem, correct?

12   A.   Correct.

13   Q.   Until this stop?

14   A.   Until the 2013 stop, yes.

15   Q.   And so he was subject to removal proceedings at that

16   point?

17   A.   Yes, ma'am.

18   Q.   And did he go before an immigration judge?

19   A.   He did indeed, yes, ma'am.

20   Q.   And to your knowledge, what did the immigration judge do?

21   A.   The immigration judge released him on personal

22   recognizance and gave him legal permanent residence status.

23   Q.   And so since -- was that 2014?

24   A.   Yes, ma'am.

25   Q.   So since 2014 he actually has had lawful permanent

```
 1    resident status not based on the fraudulent documents, correct?
 2    A.   Correct.
 3    Q.   And do you have any idea why the immigration judge made
 4    this --
 5              MR. ERKAN:  Objection.
 6              THE COURT:  Ms. Steinberg, please.  Can we wrap this
 7    up?
 8              MS. STEINBERG:  Yes.  Will you give me one minute,
 9    Your Honor?
10              THE COURT:  Yes.
11              (Pause.)
12              MS. STEINBERG:  We'll tender the witness, Your Honor.
13    Thank you.
14              THE COURT:  All right.  Mr. Erkan?
15              MR. ERKAN:  Thank you, Your Honor.
16                         CROSS-EXAMINATION
17    BY MR. ERKAN:
18    Q.   Hello, Trooper.  How are you today?
19    A.   Good.  How are you, sir?
20    Q.   Very good.  Thank you, sir.
21              This particular informant that had the contact with
22    the Mexican national, did you handle this informant?
23    A.   I did not.
24    Q.   How long had that individual been an informant with HSI?
25    A.   I do not know that, sir.
```

1    Q.    But he has been in the past reliable for purposes of HSI

2    standards?

3    A.    Yes, ma'am -- yes, sir.

4    Q.    No problem.

5           And with respect to this particular case, the CI

6    indicated that it had contact with this Mexican national, and

7    that is how the matter first came to the attention of law

8    enforcement?

9    A.    Yes, sir.

10   Q.    How did the CI get into contact with this Mexican

11   national?

12   A.    I do not know that, sir.

13   Q.    Okay.  How long had CI been in contact with the Mexican

14   national?

15   A.    I believe since May, sir.

16   Q.    And you don't know how the two met?

17   A.    No, sir.

18   Q.    And is it your understanding that immediately the CI was

19   able to be in a position of sufficient trust and negotiate a

20   large scale interstate drug delivery with the Mexican national?

21   A.    Yes, sir.

22   Q.    And do you know how the CI was able to get into that

23   position of trust?

24   A.    I do not.

25   Q.    The Mexican national, is this an individual that was ever

1    on the radar screen of HSI or the Federal Government, to your
2    knowledge?
3    A.    Not that I'm aware of.
4    Q.    The -- in terms of the conversations with the Mexican
5    national, you've indicated that the CI speaks no Spanish,
6    correct?
7    A.    That is correct.
8    Q.    To your knowledge, does the Mexican national speak any
9    English?
10   A.    To my knowledge, the Mexican does not speak English at
11   all.
12   Q.    The UC was introduced to the Mexican national on or about
13   June 11th; is that true?
14   A.    I believe the first conversation was June 11, yes, sir.
15   Q.    There was a drug transaction arranged with the CI, the
16   Mexican national to occur in the middle of May 2019, fair to
17   say?
18   A.    Yes, sir.
19   Q.    Over what period of time was that transaction negotiated,
20   to your knowledge?
21   A.    I have no knowledge of that, sir.
22   Q.    How is it that the CI was communicating with the Mexican
23   national given the language barrier?
24   A.    I am not aware of that, sir.
25   Q.    What information do you have regarding the number of

```
 1   drivers that the Mexican national has?
 2   A.   I have no knowledge of that.
 3   Q.   There was a deal that was good to go in the middle of May,
 4   according to what the CI claimed, correct?
 5   A.   They were in the process of trying to put together a deal.
 6   Q.   And the deal began in the sense that it was placed in
 7   motion with the transport of five kilos as ordered?
 8   A.   I'm not aware of that, sir.
 9   Q.   Are you -- you had indicated that you had familiarized
10   yourself with the investigation documents in this case,
11   correct?
12   A.   Correct.
13   Q.   Have you reviewed the affidavit which was submitted in
14   support of the application for complaint in this case?
15   A.   Yes, sir.
16   Q.   Are the contents of that affidavit true, to the best of
17   your knowledge?
18   A.   Yes, sir.
19   Q.   And in Paragraph 7 of the affidavit, does the affiant
20   indicate, quote, "After further discussion, UI agreed to start
21   by selling the CS five kilograms of fentanyl for $40,000 per
22   kilogram," followed by the next paragraph, 8, "Following this
23   initial call, additional telephone conversations between the CS
24   and the Mexican national, referred therein as UI, occurred
25   during which UI used different phone numbers.  UI, the Mexican
```

1    national, indicated that the driver had been pulled over in the

2    New York area for a broken windshield and for that reason the

3    transaction was terminated"?

4    A.   Yes, sir.

5    Q.   Okay.  And so, have I refreshed your recollection

6    regarding the five-kilo deal that was in place and in progress

7    in the middle of May?

8    A.   Yes, sir.

9    Q.   Okay.  And that deal fell apart because the driver was

10   himself arrested in transit?

11   A.   I believe so, yes, sir.

12   Q.   And according to the CI, according to the Mexican

13   national?

14   A.   Yes, sir.

15   Q.   And is it true that, according to the CI, the Mexican

16   national was apologetic and was essentially scrambling to put

17   the deal back together?

18   A.   The Mexican national was attempting to complete the deal,

19   yes, sir.

20   Q.   Okay.  Said "I'm going to make it good" essentially?

21   A.   Yes, sir.

22   Q.   Okay.  And then -- is it true that nothing more occurs

23   until June 8th of 2019 where the deal is essentially revived?

24   A.   Yes, sir.

25   Q.   Okay.  So it took several weeks for the deal to get placed

1   back on track, at least, or so it appears per the

2   investigation?

3   A.   Yes, sir.

4   Q.   And that is when we learn about the new driver, fair to

5   say?

6   A.   That's where the deal is now put back in place, yes, sir.

7   Q.   Okay.  And prior to June 8th, 2019, was there any

8   information that the Mexican national had acquired a new driver

9   prior to that date?

10  A.   Not that I'm aware of, no, sir.

11  Q.   Okay.  And so, to your knowledge, the Mexican national had

12  acquired that new driver sometime between the May 18th initial

13  deal where his first driver got arrested and June 8th of 2019,

14  fair to say?

15  A.   Yes, sir.  Yes, sir.

16  Q.   And so, to your knowledge, there was no information that

17  the new driver had ever done a delivery before?

18  A.   No, sir.

19  Q.   Okay.  In terms of the actual time and location of the

20  ultimate delivery, that was set by police, fair to say?

21  A.   On the 12th?

22  Q.   Yes.

23  A.   Yes, sir.

24  Q.   The Mexican national wanted to the deal to go forward

25  earlier, maybe on the 8th; is that fair to say?

```
 1   A.   Correct.

 2   Q.   But the police through their undercover investigation were

 3   able to control the date and time and location of the delivery?

 4   A.   Correct.

 5   Q.   What say did the driver have in that?

 6   A.   Zero.

 7   Q.   At the time of the actual conversations with the driver,

 8   did the driver even know how much money he was to receive?

 9   A.   There was miscommunication as to how much money he was to

10   receive.

11   Q.   The question is, did the driver even know how much money

12   he was to receive?

13   A.   I don't believe so, no, sir.

14   Q.   Okay.  So, in fact, according to the affiant, the driver

15   indicated that he, quote, was not told how much?

16   A.   Correct.

17   Q.   You indicated that the driver indicated over the telephone

18   that the driver was aware that it was China White that was the

19   subject of this transaction.  That was in a phone call between

20   the driver and Ruben?

21   A.   Yes, sir.

22   Q.   Okay.  And in that same conversation, the driver indicated

23   he was delivering five cars?

24   A.   Yes, sir.

25   Q.   And my understanding is through contacts and your training
```

1    and experience that the cars referred to the product?

2    A.    Correct.

3    Q.    And all of that was laid out in the affidavit?

4    A.    Yes, sir.

5    Q.    Now, just -- I know that you are one of the affiants, but

6    is it fair to say that you might be mistaken with respect to

7    the driver indicating knowledge of what those five cars

8    contained in that conversation?

9    A.    As far as it being China White?

10   Q.    Yes.

11   A.    They could have just said five cars of drugs, even though

12   he's delivering five kilos of narcotics.

13   Q.    Okay.  So my question to you is you earlier stated that it

14   was your understanding that the driver stated he knew he was

15   delivering China White during that call with Ruben, who was the

16   UC?

17   A.    Ruben is the UC, correct.  Yes, sir.

18   Q.    But do you -- do you recall for a fact that the driver

19   told the UC that he was dealing with China White?

20   A.    I would have to review the report to do that, sir.

21   Q.    Not a problem.

22   A.    Okay.

23          MR. ERKAN:  With the Court's permission, may I

24   approach the witness?

25          THE COURT:  Yes.

1               (Attorneys confer.)

2    Q.    Sir, if you wouldn't mind looking at Paragraph 14.

3    A.    (Witness reviews document)  Yes, sir.

4    Q.    Okay.  So it's fair to say that to your knowledge during

5    the conversation between the Defendant and the UC, Ruben, the

6    Defendant -- or the driver, I should say, did not reference the

7    type of cars that he was delivering?

8    A.    That is correct.

9    Q.    Thank you, sir.

10              MR. ERKAN:  May I approach to retrieve the exhibit,

11   Judge?

12              THE COURT:  Yes.

13   Q.    Ultimately, however, when the transaction occurs, you had

14   testified that the CI discussed what was being turned over with

15   the driver?

16   A.    Correct.

17   Q.    And it was just the CI who approached the car?

18   A.    Correct.

19   Q.    And it's recorded on a wire?

20   A.    Yes, sir.

21   Q.    And the CI, you had indicated, stated to the Defendant

22   it's fentanyl or it's China White?

23   A.    Correct.

24   Q.    And the Defendant affirmed?

25   A.    Yes, sir.

1  Q.   Okay.  But you recognize that the Defendant doesn't speak

2  English as far as you know?

3  A.   Yes, sir.

4  Q.   And you indicated that the CI doesn't speak Spanish as far

5  as you know?

6  A.   Correct.

7  Q.   The Defendant, did he use the word "fentanyl"?

8  A.   I do not know that, sir.

9  Q.   You don't know information that he did; it was rather that

10  the CI used the word "fentanyl"?

11  A.   Correct.

12  Q.   So as far as you know, the word "fentanyl" did not come

13  out of that man's mouth?

14  A.   I do not know, sir.

15  Q.   And subsequently when the Defendant was interviewed by

16  police, which interview was recorded, he maintained that he

17  knew it was drugs but just didn't know what kind?

18  A.   Correct.

19  Q.   And that was an interview with a Spanish-speaking

20  individual?

21  A.   Spanish-speaking, correct.

22  Q.   Who was the agent who Mirandized the Defendant at the

23  scene of the arrest?

24  A.   It was two agents.  It was Special Agent Rodney Vega from

25  the DEA and Ruben Paulino from HSI.

1    Q.   And the document which you have identified as Exhibit 4 is

2    in fact the card that was presented to the Defendant at the

3    scene?

4    A.   This is the sheet of paper that was presented to him, yes,

5    sir.

6    Q.   I see.  I beg your pardon.  So it was a sheet of paper

7    that was used at the scene to give the Miranda?

8    A.   To sign, and the Miranda was read off of Rodney Vega's

9    card.

10   Q.   Okay.  So what you have there introduced as Exhibit 4 is

11   not what was used to read Miranda to the Defendant as far as

12   you know?

13   A.   Yes, sir.

14   Q.   Okay.  It was a card which we don't have?

15   A.   Correct.

16   Q.   Sir, excuse me, I simply don't recall.

17            Did you indicate that there was a jacket over the

18   backpack that was in car -- or the bag that was in the car?

19   A.   Yes, sir.

20   Q.   And that jacket, was -- was that ever recovered by police?

21   A.   Not that I'm aware of, sir.

22   Q.   Was the jacket searched?

23   A.   I did not search the vehicle, so I can't say that, sir.

24   Q.   And so you have no knowledge as to whether it was ever

25   searched, the jacket?

1    A.    Correct.

2    Q.    Okay.  You indicated that the CI sort of arrived on scene

3    as a package deal with this co-CI?

4    A.    Correct.

5    Q.    And the vehicle in which they arrived, was that a law

6    enforcement vehicle?

7    A.    It was not.

8    Q.    Who conducted the search of the vehicle?

9    A.    That would have been -- there was four agents that

10   conducted the search of the vehicle and the two CIs.

11   Q.    Are you familiar with the use of hidden compartments in

12   vehicles, aftermarket hidden compartments?

13   A.    Yes, sir.

14   Q.    And was it ever made to -- determined whether or not that

15   particular vehicle might have contained an aftermarket hidden

16   compartment?

17   A.    The vehicle was searched, yes, sir.

18   Q.    Including by people who are able to identify hides?

19   A.    Law enforcement, yes, sir.

20   Q.    Were the law enforcement officers able to identify a hide?

21   A.    Some are better than others, but yes, sir.

22   Q.    And the agents that were involved in the search of this

23   vehicle, are they trained to locate hidden compartments, as far

24   as you know?

25   A.    As far as I know, yes, sir.

1   Q.   Was the search process video recorded at all?

2   A.   I do not know, sir.

3   Q.   Okay.  Would that be customary, to video record the search

4   of the vehicle?

5   A.   I do not believe so, no, sir.

6   Q.   All right.  Where was that search of the vehicle

7   conducted?

8   A.   I do not know.

9   Q.   Who was it that had eyes on the CIs prior to following the

10  search of the vehicle up to the point of delivery?

11  A.   That would have been Special Agent Ruben Paulino as well

12  as acting group supervisor Pat Cunningham.

13  Q.   So between the two of them, they maintained eyes on the CI

14  vehicle from the point of search to the point of delivery?

15  A.   There were several of -- multiple people that were there,

16  yes, sir.

17  Q.   Did either of those two agents lose the eye as far as you

18  are aware?

19  A.   They did not.

20  Q.   So those two agents had the eye the entire time?

21  A.   Yes, sir.

22  Q.   In terms of the meet location, you all as law enforcement

23  agents selected a location that was tactically advantageous for

24  purposes of surveillance?

25  A.   Correct.

1    Q.   And would you be able to describe where in the lot that

2    was?

3    A.   Yes, sir.

4    Q.   Please, if you wouldn't mind.

5    A.   The hotel was located in like an industrial park, off an

6    industrial park road.  You pull into the entrance for the

7    hotel.  The hotel is directly in front of you.  There was a

8    parking lot that goes all the ways around the building.  The

9    actual stop where the gentleman parked his vehicle and the blue

10   car was to the left looking at the hotel on the left-hand side.

11   Q.   Would that be to the left-hand side of the front of the

12   hotel?

13   A.   Looking at the front of the hotel, to the left, though.

14   Q.   Very good, then, sir.

15        And approximately how far away from the front of the

16   hotel was this?

17   A.   Maybe half a football field.

18   Q.   Very good.  And are you aware of whether or not there were

19   surveillance cameras that are located at the hotel that would

20   capture this interaction?

21   A.   I am not aware of that.

22   Q.   Were there planes or other surveillance vehicles or

23   equipment utilized to record the transaction itself?

24   A.   I'm not aware of that, sir.

25   Q.   Okay.  Were there any other cars that were parked in the

1    immediate vicinity of the transaction itself?

2    A.    Yes, sir.

3    Q.    Non-law enforcement vehicles?

4    A.    Yes, sir.

5    Q.    With respect to the CI vehicle and the Defendant's

6    vehicle, were there any cars intervening between the two?

7    A.    Yes, sir.

8    Q.    Okay.  How many spaces apart were they?

9    A.    Maybe 20 or so, sir.

10   Q.    Oh, okay.  And would you be able to tell the Court how

11   many spaces of those 20 were occupied?  Was it all of them,

12   half of them or some --

13   A.    I don't recall, sir.

14   Q.    Okay.  And fair to say that -- when was the CI informed of

15   the location for the delivery?

16   A.    On the 12th?

17   Q.    Yes.

18   A.    On the 12th.

19   Q.    Okay.  Had the CI been involved in deliveries at that

20   location in the past, as far as you're aware?

21   A.    Not that I'm aware of.

22   Q.    And was the CI -- where was the CI when the CI was

23   informed about the location of delivery?

24   A.    The CI would have been with the controlling agent and the

25   supervisors for the briefing.

1    Q.    Okay.  And so, to be fair, then, the CI would not have had

2    any foreknowledge that we were going to pick this particular

3    location?

4    A.    Correct.

5    Q.    Thank you.  I appreciate that.

6                With respect to the telephones that were located in

7    the vehicle, how -- strike that.

8                How many phones were located on the Defendant's

9    person?

10   A.    I believe there was two phones located on his person.

11   Q.    Were both of those telephones active?

12   A.    I do not know, sir.

13   Q.    Were the other three phones active?

14   A.    I do not know.

15   Q.    You know only about one phone that was active, fair to

16   say?

17   A.    Correct.

18   Q.    Okay.  And that was the phone that was used in this case?

19   A.    Correct.

20   Q.    And in your training and experience as a law enforcement

21   officer, individuals that are involved in the drug trade, do

22   they frequently get a number of drug-related calls or messages

23   on their phones?

24   A.    They could, yes, sir.

25   Q.    Okay.  And in this case, the screen was captured at 3:06

1    in the afternoon, according to Exhibit 1J?

2    A.   Yes, sir.

3    Q.   And the only alerts that came up on this phone related to,

4    it looks like, a system configuration issue and someone who

5    wanted to play 8 Ball Pool?

6    A.   Yes, sir.

7    Q.   Between 3:17 in the morning and 3:06 in the afternoon?

8    A.   3:17 in the morning and 10:40 in the morning.

9    Q.   And then again up to 3:06 in the afternoon?

10   A.   Yes.

11   Q.   With respect to the package of suspected fentanyl, who

12   took custody of that, if you recall?

13   A.   I believe Special Agent Sean Rafferty took --

14   Q.   Was there any controls put in place?  Did he wear gloves?

15   A.   Of course.

16   Q.   Okay.  Some of us deal with local cases, that's not always

17   the case.  So in this case gloves were used?

18   A.   Yes, sir.

19   Q.   Were the packages fingerprinted at all?

20   A.   I do not know.

21   Q.   Was the Defendant cooperative when he was approached by

22   police?

23   A.   Yes, he was.

24   Q.   And you were able to identify his residence in

25   Pennsylvania?  He told you where he lived, correct?

1    A.    Correct.

2    Q.    And had law enforcement officers searched those premises

3    at all?

4    A.    I do not believe so, no, sir.

5    Q.    Is there any reason why that would not have occurred?

6    A.    I cannot say that, sir.

7    Q.    Okay.  So you have no knowledge that there was anything

8    drug-related or what-related in the Defendant's premises or

9    control?

10   A.    No knowledge, no, sir.

11   Q.    Do you have any reason to believe that he had any firearms

12   registered to him?

13   A.    I do not.

14   Q.    Do you have any information that the Defendant had ever

15   been involved in any violent incidents in the past?

16   A.    I do not.

17   Q.    The Defendant's vehicle was not equipped with a hidden

18   compartment; is that fair to say?

19   A.    That is correct.

20   Q.    In terms of the techniques that drug dealers will use to

21   avoid detection, one of the things that an experienced drug

22   dealer would do, it's fair to say, would be to pick the

23   location of the transaction?

24   A.    Attempt to, yes, sir.

25   Q.    And to maybe even change the location a number of times

1    prior to the deal to avoid detection by law enforcement?

2    A.    Correct.

3    Q.    Did -- the Defendant was not able to do that, correct?

4    A.    Correct.

5    Q.    And you had testified about some conversations with the

6    Mexican national about providing the information to the driver.

7    I don't know if my question is directing you to the right part

8    of your testimony or not, but did you indicate that the Mexican

9    national requested that no phone numbers or information be

10   provided to the driver?

11   A.    That is my recollection, yes, sir.

12   Q.    Do you know why that was?

13   A.    No, sir.

14   Q.    So the people that were involved in orchestrating the

15   transaction would be the Mexican national and the CI Ruben with

16   the UC, correct?

17   A.    Yes, sir.

18   Q.    And the understanding among those organizers was the

19   Defendant was to be sort of cut out of this after the deal was

20   done?

21   A.    Correct.

22   Q.    Thank you.

23            THE COURT:  Anything further, Ms. Steinberg?

24            MS. STEINBERG:  No, Your Honor.

25            THE COURT:  Thank you.  You may step down.  Any other

```
 1   witnesses or evidence?

 2           MS. STEINBERG:  No, Your Honor.

 3           THE COURT:  And, Mr. Erkan, do you have any witnesses

 4   or evidence?

 5           MR. ERKAN:  Yes, Your Honor.  If I could I would -- I

 6   have what I would like to offer as a single exhibit, which is

 7   several letters and photographs of the Defendant -- regarding

 8   the Defendant and his family.

 9           THE COURT:  Any objection, Ms. Steinberg?

10           MS. STEINBERG:  No, Judge.

11           THE COURT:  Do you have a copy for Ms. Steinberg?

12           MS. STEINBERG:  I was provided with a copy, Your

13   Honor.

14           THE COURT:  All right.  Thank you.

15           MR. ERKAN:  Please.  Or 1, whatever the numbering

16   system is.

17           THE COURT:  All right.  So Defendant's Exhibit A is --

18   which is a compilation of documents is admitted for purposes of

19   this proceeding only.

20           (Defendant Exhibit A received in evidence.)

21           MR. ERKAN:  And, Your Honor, the next exhibit I would

22   like to offer is a copy of what appears to be an original of

23   the order of the immigration judge with respect to Mr. Johanny

24   Mejia-Nunez.

25           THE COURT:  I'm sorry.  You are giving me the
```

1    original?

2             MR. ERKAN:  Yes, what I understand is the original of

3    that document.

4             THE COURT:  No.  So you're responsible for holding

5    onto the original of the exhibits.  You need to provide me with

6    a copy.

7             MR. ERKAN:  Not a problem, Judge.

8             THE COURT:  Okay.  And you have to maintain the

9    exhibits for purposes of the hearing if anyone else needs to

10   get a copy of this.

11            MR. ERKAN:  All right, Your Honor.  I beg your pardon.

12   I'll take care of that right now.

13            THE COURT:  Mr. Erkan, if you would want to submit it

14   after the fact, you can docket it.

15            MR. ERKAN:  Okay, Your Honor.

16            THE COURT:  Ms. Steinberg, is there any objection to

17   that exhibit?

18            MS. STEINBERG:  No, Your Honor.

19            THE COURT:  Actually, I'm not sure if it has

20   identifying information.  Maybe you should just provide a copy

21   to Mr. York separately.

22            MR. ERKAN:  Yes, Your Honor.  I'll do that.  Thank

23   you, Your Honor.

24            THE COURT:  Okay.  So is that Defendant's Exhibit B,

25   and it's -- do we have a title for the exhibit?

1          MR. ERKAN:  That will be Exhibit B, if the Court

2     admits it, once I have a copy of it redacted.

3          THE COURT:  Is there any objection?

4          MS. STEINBERG:  No objection, Judge.

5          THE COURT:  All right.  So Exhibit B is admitted.  You

6     just need to provide a copy to Mr. York, and then he'll put the

7     name of the document on the exhibit list.

8          MR. ERKAN:  Thank you so much, Your Honor.  That's

9     appreciated.

10          (Defendant Exhibit B received in evidence.)

11          MR. ERKAN:  And finally, I would like to call Jorguin

12     Mejia up to the stand, please.

13          THE COURT:  So how long do you anticipate the

14     testimony is going to be?

15          MR. ERKAN:  Maybe ten minutes, Judge.

16          THE COURT:  Okay.  And then what do you all want to do

17     after that?  Do you want to have him interviewed and come back

18     and argue?  Do you want to argue now and wait to get the

19     report?  What do you want to do?

20          MR. ERKAN:  I would leave it to the Court and the

21     United States Attorney, Your Honor.

22          MS. STEINBERG:  Not knowing what the report might

23     show, it might be better to get the report and then argue.

24          THE COURT:  All right.  So then -- Mr. York, do we

25     have a date -- are you able to interview him today or is it

1    going to be some other day?

2            U.S. PROBATION:  Yes, Your Honor.  I can interview him

3    right now.

4            THE COURT:  Okay.  So you will likely have the report

5    either available later today or tomorrow?

6            U.S. PROBATION:  I'm sorry, Your Honor, for

7    interrupting.

8            THE COURT:  Yes?

9            U.S. PROBATION:  So the interpreter has indicated he

10   may not be available.

11           THE INTERPRETER:  Yes, I thought we'd be done earlier.

12           THE COURT:  Yes, so did I.

13           THE INTERPRETER:  I have another court hearing and

14   then another one at 3:00.

15           THE COURT:  Okay.  All right.  So we may need to bring

16   the Defendant back in to be interviewed at another date.  So

17   sometime next week, Mr. York.  Maybe Wednesday or Thursday?

18           THE CLERK:  Court is available next Wednesday, the

19   26th, at 3:00 p.m. for a detention argument.

20           MS. STEINBERG:  I don't see any reason why that can't

21   happen, Your Honor.

22           THE COURT:  Mr. Erkan?

23           MR. ERKAN:  Yes, Your Honor.  May I propose the 25th,

24   if that is at all convenient for the Court?  I have a motion

25   hearing in the State Court, Judge, on the 26th.

```
 1              THE CLERK:  Court is available on the 25th at 3:00
 2   p.m.
 3              MR. ERKAN:  Thank you so much for the accommodation,
 4   sir.
 5              MS. STEINBERG:  I think that's fine.  I never bring my
 6   phone because I live in fear of it going off, but I think
 7   that's fine, Your Honor.
 8              THE COURT:  All right.  If it doesn't work, then just
 9   talk to Mr. Erkan and propose a new date to Mr. York.
10              Go ahead, Mr. York.
11              THE CLERK:  I was just going to say, correction, 2:00
12   p.m.
13              MR. ERKAN:  No problem.
14              THE COURT:  All right.  Mr. Erkan, your witness.
15              MR. ERKAN:  Yes.  Thank you so much, Your Honor.
16              Jorguin Mejia.  He requires the services of the
17   Spanish interpreter so I don't know if you can project.
18              THE COURT:  Wait.  How are we going to do this,
19   Ms. Steinberg?
20              THE INTERPRETER:  I can speak up.
21              THE COURT:  Right.  Do you need --
22              MS. STEINBERG:  Your Honor, I don't know if Your
23   Honor -- and I'm throwing this out there not knowing.  I mean,
24   the Government would not object to defense counsel making a
25   proffer of what this witness would say, but it's up to him.
```

1          THE COURT:  I'm just not sure how the mechanics --

2     Mr. Hadad is not a wonderful interpreter.  I'm not sure he can

3     do two jobs at the same time.

4          THE INTERPRETER:  I assume that if I am standing right

5     here and I speak up, the Defendant should be able to listen.

6          THE COURT:  Right.  Okay.  The Defendant can

7     understand the Spanish, and then you are going to translate for

8     us.  Do you want to use the headphone or you think you're fine?

9          THE INTERPRETER:  I think I should be okay.

10          THE COURT:  Okay.  All right, Mr. Erkan.

11          MR. ERKAN:  Thank you.  May the witness be sworn.

12          THE CLERK:  Please raise your right hand.

13          (Witness sworn.)

14          THE WITNESS:  Yes, I swear.

15          THE CLERK:  Please state your full name for the

16     record, spell your last name.

17          THE WITNESS:  Jorguin Mejia.  J-o-r-g-u-i-n; Mejia,

18     M-e-j-i-a.

19          THE CLERK:  Okay.  You may be seated.

20          JORGUIN MEJIA, having been duly sworn by the Clerk,

21     was examined and testified as follows:

22                         DIRECT EXAMINATION

23     BY MR. ERKAN:

24     Q.   In a nice loud voice will you tell the Court what your

25     relationship is to the Defendant.

```
1    A.    My brother.

2    Q.    Where do you live?

3    A.    In Philadelphia, Pennsylvania.

4    Q.    And where does the Defendant live?

5    A.    In Philadelphia, Pennsylvania.

6    Q.    How often do you see the Defendant?

7    A.    Every day.

8    Q.    Okay.  And do you work for a living, sir?

9    A.    Yes.

10   Q.    What do you do for work?

11   A.    Pipe fitter, piping.

12   Q.    And is that for a company?

13   A.    Yes.

14   Q.    What company, sir?

15   A.    HKA.

16   Q.    And, sir, is the Defendant married, to your knowledge?

17   A.    Yes.

18   Q.    And what is his wife's name?

19   A.    Wendy Rodriguez.

20   Q.    Is she here in court?

21   A.    Yes.

22   Q.    Would you identify her for the record?

23   A.    Yes.  She's right there (indicating).

24   Q.    What color clothing is she wearing?

25   A.    Yellow and white.
```

```
 1   Q.   And does the Defendant -- how long has he been with
 2   Ms. Mejia?
 3   A.   Approximately ten years or more.
 4   Q.   And do the two of them live together?
 5   A.   Yes.
 6           THE COURT:  Excuse me, Mr. Erkan.  You are welcome to
 7   present what you want.  This is all the information that will
 8   be in the pretrial services report.
 9           MR. ERKAN:  Okay, Judge.
10           THE COURT:  So the pretrial services officer will ask
11   the Defendant about all his family characteristics and habits
12   and -- so just so you know that and --
13           MR. ERKAN:  Yes.
14           THE COURT:  -- maybe you can tailor the testimony.
15           MR. ERKAN:  I'll keep it very limited.  I just wanted
16   the Court to hear personally from one family member, and I will
17   make it brief.
18           THE COURT:  Sure, that's fine.
19   Q.   And, sir, does the Defendant -- to your knowledge, does he
20   own any weapons?
21   A.   He does at home.
22   Q.   Okay.  And would that -- is that something that can be
23   surrendered to the Court?
24   A.   Yes.  It's legal.
25   Q.   Okay.  And has the Defendant ever been involved in any
```

1  violent incidents, to your knowledge?

2  A.    Never.

3  Q.    Does the Defendant have an occupation, as far as you know?

4  Does he work?

5  A.    Yes.

6  Q.    Okay.  And have you ever known the Defendant to be

7  involved in any criminal activity regarding drugs or otherwise?

8  A.    No, never.

9  Q.    Okay.  And do you -- are you aware of whether or not he

10  owns a home?

11  A.    Yes.

12  Q.    Okay.  Does he own any other property, to your knowledge?

13  A.    Yes.

14  Q.    What else does he own other than his home?

15  A.    He owns a garage.

16  Q.    Okay.  And does he own that jointly with his three

17  brothers?

18  A.    Two brothers and one sister.

19  Q.    And would you and your brothers and sister be willing to

20  put that garage up as assistance as a surety to the Court?

21  A.    Yes, sir.

22  Q.    Thank you.

23        THE COURT:  Ms. Steinberg, any cross-examination?

24        MS. STEINBERG:  Very briefly.

25        THE COURT:  Yes.

```
 1                      CROSS-EXAMINATION

 2   BY MS. STEINBERG:

 3   Q.   What kind of weapons does your brother have in the house?

 4   A.   I don't know exactly.

 5   Q.   More than one?

 6   A.   No.

 7   Q.   Are you sure?

 8   A.   Sure.

 9   Q.   But you don't know if it's a gun or a knife?

10   A.   I do not know exactly.

11   Q.   Did you have any idea where your brother was going last

12   Wednesday morning when he left early?

13   A.   No.

14   Q.   So he doesn't discuss everything with you, correct?

15   A.   No.  It was work-related interview.  I was going to go

16   into a new job that day.

17   Q.   On June 11th and June 12th?

18   A.   Yes.

19   Q.   So both days you were completely occupied with an

20   interview for a new job such that your brother couldn't talk to

21   you?

22   A.   No.  I was providing a test, specific test that is

23   required for my job for those two days.

24   Q.   And they went all night?

25   A.   No.  I woke up at 5:00 a.m.  I had to be there at 7:00.
```

1  So I found out about this when I was given a call and I was

2  told what had happened.

3  Q.   Did you know your brother came into the United States

4  illegally in 2003?

5  A.   I'm not sure about that.

6  Q.   Did you know he lived in the United States illegally for

7  10 years, 11 years?

8  A.   Yes.  10 years, I think.

9  Q.   And did your brother ever talk to you about fixing that

10 problem had he not been caught by law enforcement?

11 A.   No, I don't know exactly.

12 Q.   And do you know if this house and this garage that the

13 Defendant owns are owned free of any encumbrances, any

14 mortgages or?

15 A.   The garage is owned by us.  He and myself and a sister of

16 ours bought it, the three of us.

17 Q.   So there's no mortgage on it?

18 A.   No.

19 Q.   And what about the other property?

20 A.   Yes, there is a mortgage on that.

21      MS. STEINBERG:  No further questions, Judge.

22      THE COURT:  All right.  Thank you very much.  You may

23 step down.

24      So I think I will see everyone for argument on -- is

25 there -- Mr. Erkan, are you making an argument on probable

1   cause?

2          MR. ERKAN:  No, Your Honor.

3          THE COURT:  So I do find that there is probable cause

4   to believe that a crime was committed, namely possession with

5   intent to distribute 400 grams or more of a mixture and

6   substance containing a detectable amount of fentanyl in

7   violation of 21 United States Code Sections 841(a)(1) and

8   (b)(1)(A)(vi) and that the Defendant -- there's probable cause

9   that the Defendant committed that crime.  I will see everyone

10  next week, I believe -- is that right, Mr. York? -- for

11  argument.  Thank you.

12         MR. ERKAN:  Thank you, Your Honor.

13         MS. STEINBERG:  Thank you, Your Honor.

14         THE CLERK:  All rise.  Court is in recess.

15         (Recording ends at 1:44:49)

16

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Linda Walsh, Registered Professional Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9                    Dated this 23rd day of June, 2019.

10

11

12              /s/ Linda Walsh_____

13              Linda Walsh, RPR, CRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```